2017 IL App (1st) 162306

FIRST DIVISION
January 30, 2017

No. 1-16-2306

|  |  |
|---|---|
| ) | |
| ) | |
| ) | Appeal from the |
| ) | Circuit Court of |
| ) | Cook County. |
| ) | |
*In re* TYIANNA J., DAVID L., DANIEL N., and | ) | Nos. 12 JA 662
DAVION N., Minors (The People of the State of | ) | 12 JA 663,
Illinois, Petitioner-Appellee, v. Traci F., | ) | 13 JA 876, and
Respondent-Appellant). | ) | 15 JA 412
| ) | |
| ) | Honorable |
| ) | Devlin Schoop, |
| ) | Judge Presiding. |
| ) | |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Presiding Justice Connors and Justice Harris concurred in the judgment and opinion.

**OPINION**

¶ 1     This is an appeal from the circuit court's orders adjudicating the minor Davion N. a ward of the court and terminating the parental rights of Davion's natural mother, respondent Traci F. In this case the juvenile court took the somewhat unusual step of terminating Traci's parental rights as to Davion at the dispositional hearing. On appeal, Traci makes the following arguments in favor of reversal: (1) the circuit court's finding that Davion was abused and neglected was against the manifest weight of the evidence; (2) the court abused its discretion by permitting expedited termination at the dispositional hearing; (3) Traci's procedural due process rights were

violated because no hearing was held to determine if the statutory criteria for expedited termination proceedings were met; (4) Traci's procedural due process rights were violated because the court terminated her parental rights prior to conducting an adjudicatory hearing to determine if Davion was abused or neglected; (5) the court's finding that Traci was unfit was against the manifest weight of the evidence; and (6) the court's finding that termination of Traci's parental rights and the appointment of a guardian with the ability to consent to adoption was in Davion's best interest was against the manifest weight of the evidence. For the reasons that follow, we affirm the judgment of the circuit court.

¶ 2                                BACKGROUND

¶ 3     These consolidated cases involve the five minor children of respondent Traci F., who range in age from one to eight years old: Tyianna J., born February 1, 2008; David L. (David Jr.), born May 12, 2010; Hayden F., born August 17, 2012; Daniel N., born August 31, 2013; and Davion N., born April 16, 2015. Although Traci only appeals from the circuit court's orders as they apply to Davion, her history with Tyianna, David Jr., and Daniel is relevant and intertwined with Davion's case. Proceedings relating to Hayden—who was born with serious medical conditions and was ultimately adopted with Traci's consent—have little bearing on the issues raised on appeal and are not discussed in this opinion. Also omitted are discussions of the evidence relating solely to Michael J., Tyianna's father, and David L. (David Sr.), who is the father of David Jr., Daniel, and Davion, as neither father is a party to this appeal.

¶ 4                A. The Family's History of DCFS and Court Involvement

¶ 5     The Illinois Department of Children and Family Services (DCFS) first became involved with Traci and her children on October 6, 2011, when a security guard alerted Chicago police officers that two small children were seen going in and out of an apartment unit unsupervised.

Officers entered the apartment to find three-year-old Tyianna and one-year-old David alone. According to DCFS service plan narratives, "the home was filthy with a limited supply of food, and the children appeared hungry." Traci returned twenty minutes later and claimed that she had gone to get diapers and had left the children with a babysitter. Traci was arrested and charged with two counts of neglect.

¶ 6     An intact family services case file was opened on November 1, 2011, to provide intervention services. However, on June 19, 2012, the children were taken into protective custody following two incidents that led DCFS to conclude that Traci "continued to make no changes to be sure her children were adequately supervised, or with appropriate caregivers if she w[as] not at home."

¶ 7     An adjudicatory hearing for Tyianna and David Jr. was held on April 16, 2013, at which the parties stipulated to the following facts: Traci had "previously been diagnosed with depressive disorder, postpartum depression and adjustment disorder"; had a "history of non-compliance with psychotropic medication"; had "three prior reports for inadequate supervision and environmental neglect"; and was non-compliant with intact family services offered since November 2011. Pursuant to section 2-3 of the Juvenile Court Act of 1987 (Juvenile Court Act or Act), the circuit court found that Tyianna and David were neglected minors based on a lack of care (705 ILCS 405/2-3(1)(a) (West 2012)) and an injurious environment (705 ILCS 405/2-3(1)(b) (West 2012)), and were abused minors based on a substantial risk of physical injury (705 ILCS 405/2-3(2)(ii) (West 2012)). The circuit court entered dispositional orders placing Tyianna and David Jr. under DCFS guardianship and permanency orders indicating that the goal was for them to return home within 12 months. The court noted that, although Traci had not made substantial progress towards achieving this goal, she had made "some progress." The court

admonished Traci that she needed to engage in visitation and services consistently.

¶ 8 Traci gave birth to Daniel on August 31, 2013, and he was taken into custody less than three weeks later. On September 17, 2013, the State filed a petition for adjudication of wardship and a motion for the appointment of a temporary custodian for Daniel, asserting that he too was a neglected and abused minor as defined by section 2-3 of the Juvenile Court Act (705 IlCS 405/2-3 (West 2012)). In support of its petition, the State cited Traci's past diagnosis of depression and noncompliance with medication, the fact that she had three other minors (Tyianna, David Jr., and Hayden) in DCFS custody on findings of abuse and neglect, and her noncompliance with services. The circuit court took temporary custody of Daniel and he was placed in foster care with Tyianna and David Jr.

¶ 9 Following an adjudicatory hearing held on May 16, 2014, the circuit court entered an order finding that Daniel was a neglected minor based on an injurious environment (705 ILCS 405/2-3(1)(b) (West 2012)) and an abused minor based on a substantial risk of physical injury (705 ILCS 405/2-3(2)(ii) (West 2012)). The court based its ruling on the parties' stipulations of fact, including the prior findings relating to Tyianna and David Jr. and evidence relating to Traci's lack of participation in the services that were recommended to correct the circumstances leading to their removal from Traci's care.

¶ 10 That same day, the circuit court held a dispositional hearing for Daniel and a permanency hearing for Tyianna and David Jr. The goal set for Daniel and maintained for Tyianna and David Jr. was to return home within 12 months. The circuit court again concluded that there had been "some progress" but not substantial progress and warned Traci that she was "fast approaching *** the point where [the court would] have to change the goal."

¶ 11 After failing to attend several previous appointments, Traci completed a psychiatric

evaluation in June 2014. The psychiatrist who evaluated her did not diagnose her as depressed but stated that she needed to attend counseling to work on her issues. Traci had previously been discharged from therapy for a lack of attendance but in July 2014 she was again referred for individual therapy. According to DCFS service plans, her therapist reported that she would often cancel due to sickness, "falling into the same pattern that led her to the initial discharge." Between July and the end of September 2014, the therapist reported seeing Traci only twice.

¶ 12   On September 12, 2014, at a combined permanency hearing for Tyianna and David Jr. and dispositional hearing for Daniel, the circuit court changed the goal for Tyianna and David Jr. to substitute care pending termination of parental rights, resulting in Traci's entitlement to visits with them decreasing from once per week to once per month. The goal for Daniel remained to return home within 12 months and Traci continued to be allowed to visit Daniel once per week.

¶ 13                    B. Davion's History of DCFS and Court Involvement

¶ 14   Davion, Traci's youngest child and the one who is the subject of this appeal, was born on April 16, 2015, and taken into custody from the hospital within a matter of days. On April 24, 2015, the State filed a petition for adjudication of wardship and a motion for the appointment of a temporary custodian, asserting that Davion was a neglected and abused minor as defined by section 2-3 of the Act (705 ILCS 405/2-3 (West 2014)). The State noted that Traci had four other children in DCFS custody with findings of abuse and neglect, was permitted only supervised visits with these children, and was "inconsistent with reunification services." In support of its petition, the State attached the affidavit of a DCFS investigator who noted that Traci attended only two of ten prenatal visits during her pregnancy with Davion, Traci's other children were in DCFS custody, and Traci had an "unsatisfactory service plan[ ]." The investigator concluded that Traci was "a substantial risk to [Davion]." The circuit court took temporary custody of Davion

5

and he was placed in foster care with his siblings.

¶ 15    The first permanency hearing for Tyianna, David Jr., and Daniel after Davion was born was held on June 16, 2015. Citing Traci's lack of progress, the circuit court determined that the permanency goal for Tyianna and David Jr. would remain substitute care pending termination of parental rights. Recognizing that "there seem[ed] to be on the part of [Traci] some more heightened effort," however, the court declined to make any finding as to whether Traci had made progress with respect to Daniel and continued his permanency hearing to give Traci "a bit more time to show completely heightened effort."

¶ 16    Although Davion was scheduled to visit with Traci and David Sr. together two times per week and with David Sr. alone one additional time per week, DCFS reported at the June 2015 hearing that both parents were inconsistent with their visits. David Sr.'s visits ended when he was arrested on May 30, 2015, and incarcerated in Indiana for a parole violation, with his release set for July 2016, and DCFS reported that Traci missed or canceled approximately one visit per week. Although visitation reports indicate that Traci occasionally held, fed, and changed both Daniel and Davion as infants, they also indicate that she had significantly more trouble with her children as they grew older. DCFS workers noted that Traci became easily frustrated and "d[id] not like to get up and move around during her visits," causing the workers to doubt her ability "to care for children who are mobile and get into things." Although she "d[id] well with minors who [we]re not yet walking," they observed that "once they [we]re mobile she [wa]s very resistant to get up to walk around with them" and "need[ed] a significant amount of agency support during her visits."

¶ 17    It was also made clear at the June 16, 2015, hearing that Traci's participation in services remained sporadic. Traci began domestic violence services again in November 2014, but it took

her approximately six months to complete seven sessions, which she was supposed to attend weekly. Although Traci was described as a "good participant" when she attended the classes, the provider reported to DCFS that Traci's "attendance was poor, and she would often cancel due to headaches, oversleeping and having other business to attend to." Although Traci eventually completed a life skills class in August 2014 and parenting classes, she was unsuccessfully discharged from parent coaching due to a lack of progress. Caseworker Amanda Jolly testified at the June 16, 2015, hearing that, following David Sr.'s incarceration, Traci's visits with the children were "very unstructured" and "chaotic" and "the stress level of everybody in the room was pretty high." When asked to characterize Traci's progress toward reunification with Tyianna, David Jr., Daniel, and Davion, Ms. Jolly stated:

> "A. It would I'd say alternate between poor and extremely slow. There's always been patterns of attendance issues with all of her services creating an extended period of time which she ends up needing to engage into these services and then that, of course, slows down the progress within itself because you can't make progress if you don't attend. But then specifically with therapy, there's a lot of concerns that the therapist has stated she's continuing to address that have been outstanding since 2012 when the case opened."

Summarizing a conversation she had with Traci's therapist, Ms. Jolly noted that Traci's attendance had been better since Davion was born but that the therapist observed that she went "through periods and patterns of not really attending therapy and then attendance [would] get[ ] better and then she [fell] back into the pattern of not attending."

¶ 18   At the June 2015 hearing, the State also sought leave to file a motion to terminate parental rights in connection with Davion at his dispositional hearing. The State explained that it was merely asking for the right to file the petition in this manner and that doing so would have no effect on the reunification services offered to Traci. According to the State, a termination hearing would likely not take place for another six months, giving Traci "a chance to put up or shut up, to show that she c[ould] do the services." The State indicated that it would "wait on [Traci's] compliance with services to make a decision whether [to] go forward as to Davion." Traci's attorney made no argument specifically addressing the motion, instead arguing that the permanency goal for Daniel should not be changed. The court granted the State's motion to file a petition for termination at disposition with respect to Davion.

¶ 19   On August 10, 2015, the State filed petitions to terminate the parental rights of Traci and the children's respective fathers and to appoint a guardian with the right to consent to the adoption of Tyianna, David Jr., and Daniel. That same day, the State filed its motion to terminate parental rights and appoint a guardian with the right to consent to Davion's adoption at his dispositional hearing. The motion was later amended on June 8, 2016, "to add 705 ILCS 405/2-21(5) termination at dispositional hearing to conform with title of [the] motion." The sole basis for the termination of Traci's rights that the State pursued as to Davion was that Traci "fail[ed] to maintain a reasonable degree of interest, concern or responsibility as to [Davion]'s welfare" (see 750 ILCS 50/1(D)(b) (West 2014)).

¶ 20   At a status hearing held on September 28, 2015, Ms. Jolly testified that reunification services continued to be offered to Traci for Daniel and Davion. According to Ms. Jolly, Traci previously completed domestic violence and life skills classes, a parenting capacity evaluation, and a psychiatric evaluation. She was currently in individual therapy but her attendance was

"poor." For the past two weeks she had been in Missouri, stating that she had family there and was looking for employment. Traci had been re-referred for parent coaching but those sessions had not yet begun. No medication was prescribed as a result of Traci's psychiatric examination, but her therapist was working with her to address her "constant cancellations for sickness, migraine reports, and just overall lethargic attitude." Ms. Jolly reported that, according to visitation reports, from the beginning of July 2015 through the end of September 2015, Traci attended only 9 visits with her children and cancelled or did not made it to 15 visits. At the conclusion of the September 28, 2015, hearing the circuit court entered an order changing the permanency goal for Daniel to substitute care pending termination of parental rights.

¶ 21    When asked specifically about Davion at the September 28, 2015, hearing, Ms. Jolly acknowledged that he recognized Traci during visits and that she had always been a presence in his life. Ms. Jolly also agreed that the parenting capacity evaluation previously undertaken assessed Traci's ability to parent all four children, not just Daniel and Davion. She also acknowledged that the prior parent coaching was terminated before Davion was born.

¶ 22    The issue of expedited termination for Davion was again raised at the September 28, 2015, hearing. Traci's counsel, stating that she had just been made aware of the State's motion, asked for an opportunity to object in writing and the parties briefed the issue.

¶ 23    A hearing was held on November 30, 2015, regarding Traci's objections to the motion to terminate her parental rights as to Davion at the dispositional hearing. The circuit court concluded the hearing as follows:

> "All right. I have obviously read the papers. I am certainly
>
> knowledgeable about the status. I am inclined to agree with the
>
> State. Mother is left to considerable proofs at the point of

disposition. So I am going to allow the People to proceed. And certainly [Traci] through her counsel can put forth all of the evidence that would mitigate against termination and dispo at that time."

¶ 24     Following this determination, Ms. Jolly provided the court with another status report. Ms. Jolly testified that Traci had been discharged from individual therapy for noncompliance, which was at that time the only ongoing service in which she was engaged; had not visited her children at all in the past two months; and had had no contact with Ms. Jolly outside of court. According to Ms. Jolly, Traci indicated that she had some medical issues to take care of relating to a heart murmur and would be having surgery some time during the next month. Traci's therapist had "expressed ongoing concerns about possible depression," despite the fact that depression had been ruled out in a previous psychiatric evaluation, and had advised Traci to engage in individual therapy consistently, which she was not doing currently.

¶ 25          C. Adjudicatory, Dispositional, and Termination Hearing

¶ 26     A two-day evidentiary hearing began on March 23, 2016, and continued on June 7, 2016. The stated purpose of that hearing was for the court to hear overlapping evidence regarding whether Davion was abused or neglected (*i.e.*, an adjudicatory hearing) and concerning Traci's fitness as to Tyianna, David, Jr., and Daniel, which would also apply to Davion if he was later adjudged a ward of the court.

¶ 27     The circuit court first took judicial notice of the adjudication and disposition orders for Tyianna, David, and Daniel and admitted a number of exhibits into evidence, including DCFS family service plans and visitation reports, certificates of completion, and evaluations from various service providers. The court then heard testimony from caseworker Amanda Jolly and

Dr. Anne Devaud, the clinical psychologist referred to assess Traci's parenting capacity.

¶ 28    Ms. Jolly testified that she was assigned to Traci and her family in June 2013 but was familiar with the case from its inception because she had acted as a supervisor for the prior caseworkers. Ms. Jolly acknowledged that Traci had made some progress. When she was engaged with parent coaching she had made some improvement, her children always seemed comfortable and happy to see her, and she had improved in her ability to praise them and interact with them. Although Traci always indicated that she wanted her children returned to her and expressed a willingness to engage in services, Ms. Jolly testified that Traci had been unsuccessfully discharged from parent coaching once and from individual therapy twice for poor attendance. Ms. Jolly reported that Traci was recently referred for a third time to individual therapy but failed to appear at two separate intake appointments. Ms. Jolly described Traci's visits with the children as "erratic" and observed that she had difficulty controlling the children during visits. In Ms. Jolly's opinion, Traci's poor attendance had "impeded her ability to really work on issues regarding her own stability, her own mental health, and how that relates to her parenting." Ms. Jolly believed that Traci was consequently no closer to having her children returned to her than she had been when Ms. Jolly was assigned to the case in 2013.

¶ 29    Dr. Devaud testified that, in May 2013, her clinic was asked to prepare a parenting capacity assessment addressing whether Traci was ready to have unsupervised visits. After reviewing Traci's file, interviewing her for a total of three hours, and observing her with the children, Dr. Devaud concluded that Traci suffered from "depression coupled with lethargy and irritability" and failed to show warmth to the children. She further concluded that there was a poor likelihood that Traci would be able to parent the children on her own. At that time, Dr. Devaud had recommended therapy and parent coaching, services that had already been

11

unsuccessfully offered. She noted that Traci "did appear to have a pattern of poor follow-through."

¶ 30    Following this testimony, the court continued the case until June 30, 2016, for its rulings on fitness and a possible termination and best interest hearing. On June 30, 3016, the court found Traci unfit as to Tyianna, David Jr., and Daniel, pursuant to subsection (m) of section 1(D) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2014)). The court made the following findings with respect to these three minors:

> "The testimony is very clear, and the evidence is very clear to this Court that over the course of nearly four years, mom was discharged on three separate occasions without successfully completing her individual therapy, was discharged for lack of participation in parent coaching, and was essentially in denial about the need to meaningfully participate in domestic violence counseling because she was in denial about dad's [David Sr.'s] controlling behavior.
>
> * * *
>
> And when mom did have visits with her children, she essentially was overwhelmed. The testimony is clear that there are times when mom just couldn't deal with the kids in a nurturing manner. ***
>
> * * *
>
> And I want to bend over backwards to give anybody a shot at trying to keep their kids. But there comes a point, and I really

honestly had to say objectively that four years is that point, that it's got to just stop."

¶ 31    The court additionally found that—with respect to Tyianna, David Jr., and Daniel—Traci was unfit pursuant to subsection (b) of that same section (750 ILCS 50/1(D)(b) (West 2014)):

"I do believe that [Traci] did have interest in her children. I do think she was concerned. This is not a case where she just blew it off and didn't show up and didn't care.

I think for whatever reason, she just was unable to really assume true meaningful responsibility for the welfare of her kids to be able to engage in a meaningful and loving nurturing manner. And whether it's her tone, affect, or whatever, she just wasn't able to do that with these kids as was evidenced by multiple parent-child visits, parent coaching sessions, and the rest.

I think that that's been fully established by the evidence, and therefore, I'm going to find with respect to Ground B that she just was unable to perform that responsibility with respect to the children's welfare. That will be my finding with respect to B.

* * *

I am not finding, and nobody should argue or should construe that with respect to [subsection (b)] that I'm finding natural mother had a lack of interest or lack of concern. I am not making that finding and I am expressly stating that I am not making that finding."

13

¶ 32    The court then addressed the proceedings involving Davion. It noted that, although the Juvenile Court Act permits the expedited termination of parental rights, the court was concerned, procedurally, that Davion had not yet been formally adjudicated as neglected or abused. The court was reluctant to presume "that past performance [wa]s a[n] indicator of future performance," or that it would be impossible for Traci to ever make substantial progress. Considering the lack of progress in the year following Davion's birth, however, the court ultimately concluded that "it ain't going to get any better" and made a finding that Traci was also unfit as to Davion, explaining:

> "Well, as much as I might think – and it bothers me in terms of a notion of fairness. The answer is no, we're not stopping this today. If I had to sort of say that out loud and work it out for myself, work it out – be able to look you in the eye, ma'am, and say it to you, well, I've done it. Because at the end of the day I have to do what I think is in the best interest of your children, all of them. And the notion that since today is June 30th and while we started this hearing back on March 23rd, so arguably maybe two weeks shy when this case came in, the question is what was going on essentially for the preceding 10 or 11 months and I've heard and seen nothing to suggest that there was significant, substantial enough substantive progress either exhibited by you *** to suggest that this is going to get any better.
>
> So with respect to Davion I think that the State's met its burden with respect to [subsection (b) of section 1(D) of the

Adoption Act].”

¶ 33    The court then stated that it was ready to proceed to a termination best interest hearing for all of the children. At that point the court was reminded by counsel that, with respect to Davion, a finding of neglect and abuse would first need to be made and a dispositional hearing held before the court could terminate Traci's rights as to Davion or find her unfit. The court agreed that this was the proper sequence of events. It made a finding that Davion was neglected based on a theory of anticipatory neglect and abused based on a substantial risk of physical injury. The court then continued the matter until July 6, 2016, for a continued dispositional hearing for Davion and a continued termination of parental rights hearing.

¶ 34    On July 6, 2016, the circuit court clarified what had occurred at the prior hearing. It explained that the testimony presented at the two-day evidentiary hearing conducted on March 23, 2016, and June 7, 2016, was admissible for purposes of Davion's adjudication and dispositional hearings; the termination of parental rights hearing for Tyianna, David Jr., and Daniel; and, depending on the outcome of his adjudicatory and dispositional hearings, for the termination of parental rights hearing for Davion as well. The court reiterated its unfitness findings with respect to Tyianna, David Jr., and Daniel and then turned its attention to Davion. The court first entered a dispositional order adjudicating Davion a ward of the court. It then found Traci unfit pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2014)) “for the same reasons, the same fitness findings [made] with respect to the other children.”

¶ 35    The circuit court then conducted a best interest hearing for all four children. It first heard from Tramaine Parker, a caseworker who had been assigned to the family since March 2016. Mr. Parker testified that Davion and three of his siblings lived with their foster mother, Lynette

Toler, and Ms. Toler's three adult daughters. Tyianna and David Jr. had lived with Ms. Toler for four years—since they were first taken into custody—Daniel had lived with her for all but the first weeks of his life, and Davion had never lived anywhere else. Mr. Parker testified that he had observed the children interact with Ms. Toler and "you can tell they're very comfortable in their placement." When asked to describe Davion's relationship with Ms. Toler, Mr. Parker stated: "Oh yes. He's bonded to her, he's very much so *** the way he looks at her and is with her, he's comfortable with her." He reported that Davion was loving with Ms. Toler and went to her, and that Ms. Toler soothed Davion when he cried, fed him, and was nurturing to him. Mr. Parker had also observed the children with two of Ms. Toler's three adult daughters, who watch the children when Ms. Toler was at work, and noted that they had also bonded with the children and were helpful and nurturing with Davion. Mr. Parker had also observed Traci visit with Davion. He testified that when he discussed with Traci the possibility that her parental rights could be terminated Traci had a "nonchalant attitude," as if "she really d[id]n't care." In Mr. Parker's opinion, it was in the best interest of all of the children for Traci's parental rights to be terminated and for the public guardian to be authorized to consent to adoption.

¶ 36 The court then heard from the children's foster mother, Lynette Toler. Ms. Toler agreed that it was important for the children to have a relationship with their other brother, Hayden. To this end, she coordinated with Hayden's foster mother, who brought Hayden to Ms. Toler's home to visit and play with the children. Ms. Toler explained that, although it had taken the older children a while to get to know her, Daniel and Davion, who lived with her from the start, were very comfortable and content. Ms. Toler described one-year-old Davion as "a very happy baby," who liked to eat and play. She believed that a recent seizure Davion suffered might be hereditary because David Sr. once indicated that he suffered from epilepsy, information that Ms. Toler

passed on to Davion's doctors. Ms. Toler testified that her job as a nurse sometimes required her to work night shifts, but that her adult daughters helped her care for the children. She agreed that she had "a lot of help"—a set of triplets who were 23 years old and still lived with her and another 22-year-old daughter. Ms. Toler further testified that the children had been accepted into her extended family. She stated that, if she were to adopt the children, she had no problem with them continuing to have contact with Traci, as long as it was not confusing for them. Finally, Ms. Toler explained why she wanted to adopt all four children, stating:

> "You can't have kids in your home and not feel like they're family,
>
> and they're family to me. They're like my four youngest children. I
>
> don't look at them as adopted children or foster children. So I love
>
> them.
>
> * * *
>
> *** I mean they've been in my home for the last four years, the
>
> last two years, and in the last year. And I just feel that they feel this
>
> is home and that's how I feel, that its home to them."

¶ 37    Traci called no witnesses but asked the court to take judicial notice of the testimony offered by Ms. Jolly at the fitness hearing and the DCFS visitation records, which she argued demonstrated that the children had a bond with her that should not be terminated. Traci pointed out that continued contact with biological parents is important, especially in light of the recent seizure suffered by Davion, which could be caused by a genetic condition. Traci argued in favor of a permanent guardianship situation as an alternative to termination and adoption.

¶ 38    Following argument, the circuit court stated that it would not agree to continue the current situation indefinitely. It found that it was in the best interest of the children, including

Davion, for Traci's parental rights to be terminated. The court then explained how each of the statutory factors supported its decision. The foster mother had provided for "the physical safety and welfare of the child[ren], including food, shelter, health, and clothing," for the past four years and, in Davion's case, for his entire life. The children's identities were developed in Ms. Toler's home. They called her "Mom," recognized her older daughters as their siblings, and were attached to her extended family. The court concluded that adoption by Ms. Toler would be the least disruptive placement for the children and was concerned that a guardianship situation "would be just a continued exercise in dysfunction." The court acknowledged that it had heard no specific testimony regarding the children's wishes, but concluded that this did not prevent it from making a decision based on the totality of the evidence submitted, particularly given the young ages of Daniel and Davion.

¶ 39    On July 6, 2016, the circuit court entered adjudication, disposition, and termination orders memorializing its findings made on the record. Traci's parental rights to Tyianna, David, Daniel, and Davion were involuntarily terminated. The court found by clear and convincing evidence that, with respect to all four children, Traci was an "unfit person" based on her "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child[ren]'s welfare" (750 ILCS 50/1(D)(b) (West 2014)). With respect to Tyianna, David, and Daniel, the court also found that Traci was unfit due to her failure during any nine-month period following adjudication to make "reasonable efforts to correct the conditions that were the basis for the removal of the child[ren]" or "reasonable progress toward the return of the child[ren]" to her care (750 ILCS 50/1(D)(m)(i)-(ii) (West 2014)). The circuit court then entered an order changing the permanency goal for all four children to "adoption." This timely appeal followed.

¶ 40                                  JURISDICTION

¶ 41    The circuit court's orders adjudicating Davion abused and neglected, making him a ward of the court, and terminating Traci's parental rights were all issued on July 6, 2016. Traci timely filed her amended notice of appeal on August 5, 2016. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rules 301, 303, and 660(b). Ill. S. Ct. R. 301 (eff. Feb. 4, 1994); R. 303 (eff. Jan. 1, 2015); R. 660(b) (eff. Oct. 1, 2001).

¶ 42                                  ANALYSIS

¶ 43    The Juvenile Court Act establishes the procedures by which a minor may be removed from his or her parents and made a ward of the court. Upon the filing of a petition for wardship by the State, a temporary custody hearing is held at which the circuit court determines whether probable cause exists to believe that the minor is neglected, abused, or dependent. 705 ILCS 405/2-10(1)-(2) (West 2014). For minors taken into temporary custody, an adjudicatory hearing is held to determine whether a preponderance of the evidence demonstrates that the minor is abused, neglected, or dependent. 705 ILCS 405/1-3(1), 2-21(1) (West 2014). Following a finding of abuse, neglect, or dependency, the circuit court must then conduct a dispositional hearing (*In re G.F.H.*, 315 Ill. App. 3d 711, 715 (2000)) to determine whether it is in the minor's best interest to be made a ward of the court and, if so, to hear evidence regarding what disposition will best serve "the health, safety and interests of the minor and the public" (705 ILCS 405/2-22(1) (West 2014)). The purpose of the dispositional hearing is usually not to terminate parental rights but "to decide what further actions are in the [minor's] best interests" and to "give the parents fair notice of what they must do to retain their rights to their child." *In re G.F.H.*, 315 Ill. App. 3d at 715.

¶ 44    Where the State further seeks to free a minor for adoption, the minor's parents must

either consent to the adoption or their parental rights must be terminated, pursuant to a two-step process. 705 ILCS 405/2-29(1.1), (2) (West 2014). The circuit court first determines if the parent is an "unfit person" pursuant to one or more grounds set out in the Adoption Act (750 ILCS 50/1(D) (West 2014)). 705 ILCS 405/2-29(2) (West 2014). This determination "must be made *** without regard to the likelihood that the child will be placed for adoption, and be based upon clear and convincing evidence." 705 ILCS 405/2-29(4) (West 2014). Only then does the court decide whether termination of parental rights is in the best interest of the minor. 705 ILCS 405/2-29(2) (West 2014).

¶ 45    The Act permits the expedited termination of parental rights in certain cases. It authorizes the circuit court to terminate parental rights at the dispositional hearing "if all of the following conditions are met": (i) "the original or amended petition contains a request for termination of parental rights and appointment of a guardian with power to consent to adoption"; (ii) the abuse, neglect, or dependency of the minor has been found by a preponderance of the evidence; (iii) parental unfitness has been found by clear and convincing evidence; and (iv) "the court determines in accordance with the rules of evidence for dispositional proceedings" that (A) it is in the best interest of the minor and the public for the minor to be made a ward of the court, (B) reasonable reunification efforts are inappropriate or were unsuccessful, and (C) termination of parental rights is in the minor's best interest. 705 ILCS 405/2-21(5) (West 2014).

¶ 46    The "Purpose and policy" section of the Juvenile Court Act provides that, so long as a ground for unfitness exits, "it may be appropriate to expedite termination of parental rights":

> "(a) when reasonable efforts are inappropriate, or have
>
> been provided and were unsuccessful, and there are aggravating
>
> circumstances including, but not limited to, those cases in which (i)

the child or another child of that child's parent was (A) abandoned, (B) tortured, or (C) chronically abused or (ii) the parent is criminally convicted of [the murder, attempted murder, or solicitation to commit the murder of a child, aggravated assault of a child, or the aggravated criminal sexual assault of a child]; or

(b) when the parental rights of a parent with respect to another child of the parent have been involuntarily terminated; or

(c) in those extreme cases in which the parent's incapacity to care for the child, combined with an extremely poor prognosis for treatment or rehabilitation, justifies expedited termination of parental rights." 705 ILCS 405/1-2(1) (West 2014).

¶ 47    On appeal, Traci contends the circuit court's orders with respect to Davion should be reversed because (1) the court's finding that Davion was abused and neglected was against the manifest weight of the evidence, (2) the court abused its discretion by permitting expedited termination proceedings, (3) Traci's procedural due process rights were violated because no hearing was held to determine if any of the statutory criteria for expedited termination proceedings were met, (4) Traci's procedural due process rights were violated because the court terminated her parental rights prior to conducting an adjudicatory hearing to determine if Davion was abused or neglected, (5) the circuit court's ruling that Traci was unfit was against the manifest weight of the evidence, and (6) the court's finding that termination was in Davion's best interest was against the manifest weight of the evidence. We address each of these issues in turn.

¶ 48                      A. Finding of Abuse and Neglect

¶ 49    We first consider Traci's argument that the circuit court's finding that Davion was abused

and neglected was against the manifest weight of the evidence. Traci insists that no evidence was presented showing that the conditions that led to the removal of Tyianna, David, and Daniel still existed in April 2015 when Davion was born and, although evidence of the neglect or abuse of other children is relevant, each child's case must be considered separately. The State and the public guardian counter that it is not necessary to wait for a child to be harmed. They argue that, under a theory of anticipatory neglect, a preponderance of the evidence in this case supported a finding that Davion would be subjected to an injurious environment or a substantial risk of harm in Traci's care.

¶ 50    The public guardian argues in the alternative that this court lacks jurisdiction to consider this issue. Illinois Supreme Court Rule 303(b)(2) provides that a notice of appeal "shall specify the judgment or part thereof or other orders appealed from." Ill. S. Ct. R. 303(b)(2) (eff. Jan. 1, 2015). Traci's amended notice of appeal indicates that she is appealing the circuit court's "[f]indings after termination of parental rights hearing" and the box for "[f]indings at an adjudication hearing" is not checked. The public guardian suggests that, by failing to check both boxes, Traci failed to specify that she was also appealing the trial court's adjudication ruling. Of course, a finding of abuse or neglect is generally not a final and appealable order; rather, "[i]t is the dispositional order from which an appeal lies." (Emphasis omitted.) *In re Smith*, 80 Ill. App. 3d 380, 381 (1980). Traci's notice of appeal does not specifically state that she is appealing the circuit court's dispositional order, which encompasses any finding of abuse and neglect. However, because it is "[t]he briefs, not the notice of appeal itself [that] specify the precise points to be relied upon for reversal," if "the appellee is not prejudiced thereby, the absence of strict compliance with the form of the notice will not be fatal." *In re Estate of Sewart*, 274 Ill. App. 3d 298, 300 n.1 (1995). The public guardian has not argued prejudice, and we conclude that

the atypical procedural history of this case weighs in favor of a liberal construction of Traci's notice of appeal. Although the circuit court made a finding of abuse or neglect on June 30, 2015, that finding was not memorialized in a written order until July 6, 2016, when the court also entered disposition and termination orders for Davion. Traci's amended notice of appeal, stating that she is appealing findings made after the termination hearing and specifying a judgment date of July 6, 2016, sufficiently complies with Rule 303(b)(2) to bring her appeal from the circuit court's termination order—including the court's contemporaneous orders making a finding of abuse and neglect and making Davion a ward of the court—within this court's jurisdiction. We therefore will consider Traci's argument that the court's finding of abuse or neglect was against the manifest weight of the evidence.

¶ 51    Because adjudication proceedings are civil in nature, a finding of abuse or neglect need only be supported by a preponderance of the evidence (705 ILCS 405/2-18(1) (West 2014); *In re A.P.*, 179 Ill. 2d 184, 204 (1997)), *i.e.*, "that amount of evidence that leads a trier or fact to find that the fact at issue is more probable than not" (internal quotation markes omitted) (*In re F.S.*, 347 Ill. App. 3d 55, 62 (2004)). Because the circuit court is in the best position to assess the credibility of witnesses, its findings of abuse or neglect are "entitled to great deference on appeal and will be disturbed only if [they are] against the manifest weight of the evidence." *In re R.M.*, 307 Ill. App. 3d 541, 551 (1999). A finding is against the manifest weight of the evidence "if review of the record clearly demonstrates that the opposite result [is] the proper one." (Internal quotation marks omitted.) *F.S.*, 347 Ill. App. 3d at 62-63.

¶ 52    The circuit court in this case found that Davion was a neglected and abused minor pursuant to those provisions of the Juvenile Court Act providing that any minor "whose environment is injurious to his or her welfare" is neglected (705 ILCS 405/2-3(1)(d) (West

2014)) and any minor whose parent "creates a substantial risk of physical injury to such minor other than by accidental means" is abused (705 ILCS 405/2-3(2)(ii) (West 2014)). Because Davion was taken into temporary custody immediately following his birth, these findings were based on a theory of anticipatory neglect.

¶ 53    "Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." *In re Arthur H.*, 212 Ill. 2d 441, 468 (2004). Although section 2-18(3) of the Act provides that "proof of the abuse, neglect or dependency of one minor shall be admissible evidence on the issue of the abuse, neglect or dependency of any other minor for whom the [parent] is responsible" (705 ILCS 405/2-18(3) (West 2014)), our supreme court has cautioned that "the mere admissibility of evidence does not constitute conclusive proof of the neglect of another minor" (*Arthur H.*, 212 Ill. 2d at 468). Cases pursued under a theory of anticipatory neglect, like any other cases concerning the adjudication of minors, must be reviewed on their own facts and must take into consideration not just the circumstances relating to the minor's siblings, but also "the care and condition of the child in question." (Internal quotation marks omitted.) *Id.* at 468-69.

¶ 54    Although it is true that Traci "engaged in numerous parenting, domestic violence, and counseling services" since Tyianna, David, and Daniel were removed from her care, it is clear from the record that her often sporadic participation in services cannot be equated with progress. As the public guardian points out, the adjudication findings for Tyianna, David, and Daniel were not based solely on specific incidents that occurred with these children, but on Traci's longstanding mental health issues and parenting deficiencies, on which Traci failed to ever make

progress.

¶ 55    Traci argues that "[t]here was no testimony that the conditions which led to the removal of Tyianna, David and Daniel"—*i.e.*, the fact that David Sr. was incarcerated when Tyianna and David were first taken into custody—"still existed in April 2015 when Davion was born." We disagree. The evidence does not at all support the conclusion that Tyianna and David Jr. were removed from Traci's care simply because David Sr. was not there to assist her. Rather, the evidence demonstrates that, even when David Sr. was with her, Traci was overwhelmed not only by the responsibility of looking after her children but also with the steps she needed to take to be reunited with them. Moreover, the circuit court certainly could not count on the fact that David Sr., with multiple prior arrests and convictions, would be there to assist Traci in caring for Davion. Indeed, in May 2015 David Sr. was again taken into custody for a parole violation and Traci indicated to the court in September 2015 that their relationship had ended.

¶ 56    The cases Traci cites, in which courts reversed findings of neglect or abuse based on anticipatory neglect, are quite distinguishable. In *Arthur H.*, 212 Ill. 2d at 444-45, four minors were removed from their mother's care after it was determined that the mother failed to provide one of the minors with necessary medical care and the other minors were found wearing clothes that smelled of urine and drinking curdled milk. The circuit court *sua sponte* directed the State's Attorney to file a neglect petition with respect to a fifth child who lived with his father in Wisconsin and was not present at any time when the incidents involving his siblings had occurred. *Id.* at 445-46. In affirming the appellate court's reversal, our supreme court made clear that its decision "should not be construed as a criticism of the theory of anticipatory neglect." *Id.* at 477. Given the specific circumstances, however—including the fact that the minor in question spent most of his time with his father in a different state, his mother lacked transportation and

thus had no easy access to him, and there was no evidence that the child's father even knew of the conditions present in the mother's home or had in any way condoned her treatment of the child's siblings—the State failed to present evidence that there was "a probable and substantial risk of future harm" to the child in question. *Id.* at 473-74, 477. Here, in contrast, although Davion never resided with Traci it was clear that if he were not made a ward of the court he would reside with her, giving rise to "a probable and substantial risk of future harm. *Id.*

¶ 57    In *In re Edricka C.*, 276 Ill. App. 3d 18, 20 (1995), two infants were removed from their mother's custody on the basis that she failed to obtain treatment for the younger child's blood disorder. When tests revealed that the child did not suffer from the alleged disorder, the State sought to amend its petition to allege for the first time that the children were exposed to an injurious environment and a substantial risk of injury, based on previous findings that the mother had, four years before, beaten her oldest child and had, two years before, left her other children unsupervised. *Id.* A DCFS child welfare specialist who had worked with the family since before the two minors were born testified that they had lived with their mother without incident, that the mother had completed domestic violence counseling and chemical abuse evaluations, and that she participated in supervised visits with her oldest child and unsupervised visits with her other children. *Id.* at 21-22. The DCFS employee further testified that the two minors were not brought into court at any time after they were born because they were never believed to be at risk. *Id.* at 21. On this record, this court reversed the circuit court's finding of neglect. *Id.* at 32. Although we viewed sibling abuse as *prima facie* evidence of neglect, we found that such a "presumption is not permanent; it weakens over time, and it can be overcome." *Id.* at 28. By urging the circuit court to look solely at past incidents of abuse or neglect while ignoring the many months the children had spent in the mother's care without incident, the State in *Edricka C.* advocated for a

*per se* rule of anticipatory neglect that we were unwilling to adopt. *Id.*

¶ 58    Traci focuses on the fact that, like her, the mother in *Edricka C.* completed some but not all of the services to which she was referred. However, in contrast to this case, when the two minors in *Edricka C.* were born, it was apparent that the mother had made significant progress and enjoyed unsupervised visitation with five of her six other children. By contrast, when Davion was born, nothing had changed, as reflected by the fact that Traci's visits with all of Davion's siblings remained supervised and she had not made substantial progress with the majority of the services offered to her.

¶ 59    Neither case alters our view that the circuit court's finding in this case that Davion was a neglected and abused minor based on a theory of anticipatory neglect was not against the manifest weight of the evidence.

¶ 60                          B. Expedited Termination Proceedings

¶ 61    Traci next argues that the circuit court erred by permitting the State to proceed with expedited proceedings for the termination of her parental rights in connection with Davion and that she was denied her right to due process because the court failed to hold an appropriate hearing to determine if there was a basis for such expedited proceedings. As noted above, the Juvenile Court Act provides for the expedited termination of parental rights under certain circumstances. Subsection (1) of section 1-2 of the Act lists three circumstances in which "it may be appropriate to expedite termination of parental rights." 705 ILCS 405/1-2(1) (West 2014). Traci reads the provisions of subsection (1) as an exclusive list of conditions, one or more of which must be met before a circuit court has discretion to authorize expedited termination proceedings. Both the State and the public guardian substantively address Traci's arguments as though they agree that subsection (1) controls the outcome of this case. We find this

understanding of subsection (1) to be incorrect. We instead believe that the relevant statutory predicate is set out in section 2-21(5) (705 ILCS 405/2-21(5) (West 2014)).

¶ 62    Subsection (1) of section 1-2 of the Act, which Traci relies on, is part of the section entitled "Purpose and policy" appearing at the beginning of Article I, which sets out the "General Provisions" of the Act. Our supreme court has made it clear that "a declaration of policy, like a preamble, 'is no part of the Act.' " *Brown v. Kirk*, 64 Ill. 2d 144, 152 (1976) (quoting *Yazoo & Mississippi Valley R.R. Co. v. Thomas*, 132 U.S. 174, 188 (1889)). See also *Illinois Independent Telephone Ass'n v. Illinois Commerce Comm'n*, 183 Ill. App. 3d 220, 236-37 (1988) (noting that "[p]refatory language such as that contained in [the initial sections of a statute] generally is not regarded as being an operative part of statutory enactments"). Statements of policy "are available for clarification of ambiguous substantive portions of [an] act" (*Independent Telephone*, 183 Ill. App. 3d at 237), but there is no need to resort to them where other, substantive provisions are unambiguous (see *Hayen v. County of Ogle*, 116 Ill. App. 3d 80, 84 (1983) (concluding that it was improper to look to the statement of policy expressed in the first section of a statute where specific, unambiguous provisions of the statute controlled)). Such is the case here.

¶ 63    Unlike section 1-2(1), section 2-21(5) of the Act (705 ILCS 405/2-21(5) (West 2014)) is mentioned only once in the parties' briefing, when the State notes that a combined evidentiary hearing for purposes of adjudication and termination findings is "contemplated" by the Act. Section 2-21(5) does more than merely contemplate expedited termination proceedings, however. It sets out the conditions that must be met before the circuit court may terminate parental rights at the initial dispositional hearing. 705 ILCS 405/2-21(5) (West 2014) ("The court may terminate the parental rights of a parent at the initial dispositional hearing *if all of the following conditions are met* ***." (Emphasis added.)). It is a cardinal rule of statutory

construction that where, as here, "the language of [a] statute is clear and unambiguous, we must apply it as written, without resort to other tools of statutory construction." *MD Electrical Contractors, Inc. v. Abrams*, 228 Ill. 2d 281, 287-88 (2008). Accordingly, we conclude that the policy statements made in subsection (1) of section 1-2 merely provide guidance—in the form of a non-exhaustive list—regarding when it "may be appropriate" for the State to seek expedited termination proceedings. That subsection does not, however, set forth the necessary criteria for early termination of parental rights, which are instead established in section 2-21(5).

¶ 64    Our reading is compelled not only by the placement of section 1-2(1) in the purpose and policy section of the Juvenile Court Act but by the language of that provision. It specifically states only that early termination "may be appropriate" in the listed situations. The non-exhaustive nature of the scenarios presented in section 1-2(1) is also evident from the language preceding the list of aggravating factors set out in subsection (a). See 705 ILCS 405/1-2(1)(a) (West 2014) ("when *** there are aggravating circumstances *including, but not limited to*, those cases in which ***" (emphasis added)).

¶ 65    Although no ambiguity in section 2-21(5) requires us to resort to other tools of statutory construction, we do note that our reading of the policy statements in section 1-2(1) is supported by the same legislative history materials relied on by Traci and appended to her brief. For example, the transcript of Senate debates over the amendments that ultimately added subsections (a) through (c) of that section 1-2(1) include the following statement by Senator Parker, a proponent of the amendments:

> "The other thing that [Senate Bill 522] does address is expediting
>
> termination of parental rights in egregious cases. *** [T]here is a
>
> concern with defining 'egregious', which we said we would work

with the Defender on. And I – for the record, we would just like to say some of the areas that may be appropriate in these cases. *We specifically didn't define all of these areas \*\*\*. Some of these that may be appropriate are*: a parent abandons a newborn infant, or a parent attempts to sell a child; a parent is convicted of manslaughter resulting from the death of a child by physical child abuse and there are other children surviving in the home; or a parent murders the other parent of a child without extenuating circumstances; or a psychiatrist reports that a mother's mental illness will substantially impair her ability to parent for at least the next few years, that a long time will pass before the mother could parent independently and that even with the professional support and monitoring, she could not give the child a permanent home." (Emphasis added.) 89th Ill. Gen. Assem., Senate Proceedings, Jan. 7, 1997, at 45-46 (statements of Senator Parker).

¶ 66    Also consistent with our understanding that section 1-2(1) was not intended to establish the necessary predicate for expedited termination are DCFS regulations, which require that agency to either specifically ask the State to seek expedited termination or to at least consider doing so in situations that do not track those set out in section 1-2(1) of the Act. See, *e.g.*, 89 Ill. Adm. Code 309.50(d)(1)(F) (2002) (DCFS must ask the State to seek expedited termination when a parent will be incarcerated for two or more years following the filing of the petition and either had little or no contact with the child or provided the child with little or no support prior to incarceration); 89 Ill. Adm. Code 309.50(d)(2)(D) (2002) (DCFS must consider expedited

termination, or document its reasons for not doing so, whenever a newborn's blood or urine contains any amount of a controlled substance, another of the biological mother's children was previously adjudicated a neglected minor, and substance abuse treatment or rehabilitation services were previously offered to the mother).

¶ 67    Finally, we are aware of no cases, reported or otherwise, that cite section 1-2(1) of the Act for any purpose, let alone for the proposition that they control when expedited termination may occur. Although not precedential, we take notice of Rule 23 orders issued by another district of this court indicating that litigants and circuit court judges in fact treat section 2-21(5) as establishing the necessary predicate for expedited termination. See, *e.g.*, *In re L.D.*, 2011 IL App (4th) 110306-U, ¶ 15 (noting that the circuit court considered the State's petition for expedited termination and, following arguments, concluded that "the preconditions for expedited termination contained in section 2-21(5) of the [Act] were met"); *id.* ¶ 27 (respondent mother argued on appeal that the "statutory prerequisites for expedited termination" found in section 2-21(5) were not met); *In re L.D.*, 2011 IL App (4th) 110307-U, ¶¶ 16-17 (rejecting argument of respondent father that expedited termination was not proper because the circuit court's findings made pursuant to section 2-21(5) were against the manifest weight of the evidence).

¶ 68    If we were to agree with Traci that subsection (c) of section 1-2(1) sets forth the statutory conditions for expedited termination in this case, Traci's argument that an additional hearing was required would be well taken. Subsection (a) of section 1-2(1) lists "aggravating circumstances" such as the abandonment, torture, or chronic abuse of a child, or the parent's conviction for certain violent crimes against a child. 705 ILCS 405/1-2(1)(a) (West 2014). Subsection (b) describes those situations where a parent's rights have already been involuntarily terminated with respect to another child. 705 ILCS 405/1-2(1)(b) (West 2014). Finally, subsection (c) addresses

"those extreme cases in which the parent's incapacity to care for the child, combined with an extremely poor prognosis for treatment or rehabilitation, justifies expedited termination of parental rights." 705 ILCS 405/1-2(1)(c) (West 2014). At the time the circuit court entered the orders at issue in this appeal, subsection (c) is the only one of these three scenarios that could have applied, since Traci was not guilty of any violent crimes and her parental rights had not yet been terminated as to her other children.

¶ 69    Subsection (c) refers to an incapacity—as opposed to a mere inability—to care for one's child. An "incapacity" is generally understood to be a "[l]ack of physical or mental capabilities" and a "prognosis" to be "[t]he process of forecasting the probable outcome of a present medical condition (such as a disease)." Black's Law Dictionary (10th ed. 2014). A factual finding that such a condition exists must generally be supported by clinical evidence of the sort not relied upon in this case. See, *e.g.*, *Caywood v. Gossett*, 382 Ill. App. 3d 124, 134 (2008) (rejecting a finding of mental incapacity where "[n]o medical evidence or affidavits from a doctor or other medical professional" were offered). However, because we do not agree that subsection (c) establishes such a condition, we need not decide precisely what the language of subsection (c) is meant to encompass or what kind of hearing a finding consistent with that subsection might require.

¶ 70    We do think that section 1-2(1) makes clear that, as a matter of policy, the State should not routinely seek termination of a parent's rights at the time of the dispositional hearing, but should, instead, expedite termination through a combined termination and dispositional hearing only in limited and "aggravated" circumstances. But Traci does not contend that the State routinely seeks early termination or that her case—involving over four years in DCFS services with no substantial progress on her part or demonstrated ability to care for her children—is a

typical case.

¶ 71 Rather than requiring the State to show that one of the specific scenarios listed in section 1-2(1) is present, in reviewing this case to ensure that Traci's statutory and constitutional rights were protected, Instead, we look to see if, at the time the circuit court terminated Traci's parental rights to Davion, the conditions set out in section 2-21(5) had been met and Traci was given a meaningful opportunity to be heard as to those conditions.

¶ 72 Section 2-21(5)(i) first requires that "the original or amended petition [for adjudication of wardship] contains a request for termination of parental rights and appointment of a guardian with power to consent to adoption." 705 ILCS 405/2-21(5)(i) (West 2014). This is obviously significant because it puts the parent on notice prior to the adjudicatory or dispositional hearing that the State will seek to terminate parental rights at the dispositional hearing. The State's original petition for adjudication of wardship for Davion, filed on April 24, 2015, did not contain such a request. However, the State later sought and was granted leave to file its "Motion for the Appointment of a Guardian with the Right to Consent to Adoption at Dispositional Hearing," which it did on August 10, 2015, well before the dispositional hearing was held. Although styled as a "motion," this document is in the form of a supplement to the State's original petition and was treated and referred to as a "supplemental petition" by Traci, who filed an answer to it on January 12, 2016. On this record, we conclude that section 2-21(5)(i) was substantially complied with.

¶ 73 The record also demonstrates that, at the adjudicatory, dispositional, and termination hearings for Davion, the circuit court made all of the findings required by the other provisions of section 2-21(5). Satisfying section 2-21(5)(ii), on June 30, 2016, the court adjudicated Davion a ward of the court, making findings on the record that he was both a neglected minor under a

theory of anticipatory neglect, injurious environment (705 ILCS/2-3(1) (West 2014)) and an abused minor, due to a substantial risk of physical injury (705 ILCS 405/2-3(2)(ii) (West 2014)). These findings were memorialized in the court's adjudication order of July 6, 2016. In its disposition order of the same date, the court found both that it was in Davion's best interest to be adjudged a ward of the court and that reasonable efforts and appropriate reunification services had been provided and were unsuccessful, satisfying the requirements of sections 2-21(5)(iv)(A) and (A-5). The circuit court likewise found in its July 6, 2016 permanency order for Davion that DCFS had made reasonable efforts to provide Traci with services and stated on the record that same day that Traci's efforts to comply with those services had been "woefully unsuccessful." With respect to section 2-21(5)(iii), the court found in its termination order of July 6, 2016, that Traci was unfit pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2014)) for failure to maintain a "reasonable degree of responsibility" for Davion's welfare. For the reasons discussed later in this opinion, we think the record supports that finding. In that same order, the court found that termination of parental rights and the appointment of a guardian with power to consent to adoption was in Davion's best interest, satisfying the condition in section 2-21(5)(iv)(B) of the Act.

¶ 74    We also reject Traci's argument that the trial court abused its discretion. We agree with Traci that, if the relevant statutory conditions are met, it is within the circuit court's discretion to consider a request by the State to terminate parental rights at the dispositional hearing. See 705 ILCS 405/2-21(5) (West 2014) (if the conditions are met, the court "may" make an expedited termination ruling). "A court abuses its discretion when its decision is fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." *People v. Collins*, 382 Ill. App. 3d 149, 153-54 (2008).

¶ 75   It is clear to us from the record in this case that the circuit court did not take its obligations lightly or proceed to expedited termination of parental rights without considering the matter fully. The court weighed Traci's interest in having additional time to demonstrate progress against Davion's interest in achieving permanency without further delay. Ultimately, the court noted that Traci had been given over a year since Davion was born to make substantial progress and had failed to do so, just as she had failed, over the course of four years, to make the progress necessary for her to have unsupervised visits with any of her other children. Under these circumstances, it was not an abuse of discretion to consider the State's request to terminate Traci's parental rights at the dispositional hearing.

¶ 76   Traci's due process argument hinges on her contention that the State was required to demonstrate—and the circuit court was required to find—that the conditions that Traci argues are required by section 1-2(1)(c) were satisfied in this case. Traci makes no similar due process argument with respect to section 2-21(5), which we conclude sets forth the actual prerequisites for expedited termination of parental rights. Because it was not argued by the parties, we decline to decide whether due process requires any sort of additional hearing in cases where the State seeks expedited termination. Even if such a hearing is required, Traci received one in this case.

¶ 77   Procedural due process is generally understood to be a " 'meaningful hearing at a meaningful time.' " *People v. One 1998 GMC*, 2011 IL 110236, ¶ 27 (quoting *United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in United States Currency*, 461 U.S. 555, 562-63 (1983)). Save for subsection (i), the provisions of section 2-21(5) require the circuit court to make findings that, as a practical matter, cannot be made until the adjudicatory, dispositional, and termination hearings, where a respondent parent already has an opportunity to be heard. This opportunity is made meaningful by the many procedural protections afforded by

the Juvenile Court Act, including "the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records and also *** the right to be represented by counsel." 705 ILCS 405/1-5 (West 2014).

¶ 78    Subsection (i)'s requirement that the State include a request for expedited termination in its original or amended petition provides the respondent parent with the necessary notice that termination of parental rights at the dispositional hearing is a possibility. Here, Traci had that notice and a meaningful opportunity to object to expedited proceedings. There was a court hearing on June 16, 2015, when the State sought leave to file its "motion" (really its supplemental petition). Traci made no objection at that time, although she was represented by counsel. There was a second court hearing on November 30, 2015, when the court specifically addressed and ruled on Traci's written objection to expedited proceedings. Thus, Traci clearly was given a hearing specific to the issue of expedited termination, if such a hearing is required.

¶ 79    Of course, these two "extra" court hearings were in addition to the hearings in March, June, and July of 2016, at the adjudication and combined dispositional and termination hearings, when it was clear that the circuit court was continuing to consider whether expedited termination of Traci's parental rights as to Davion was supported by the record before it. There can really be no dispute that Traci was given a meaningful opportunity to be heard on this issue.

¶ 80                        C. Sequence of the Court's Rulings

¶ 81    Traci additionally argues that the circuit court violated her procedural due process rights when it terminated her parental rights before conducting an adjudicatory hearing to determine whether Davion was an abused or neglected minor. We disagree with this characterization of the proceedings below.

¶ 82    It is evident that the several purposes of the two-day evidentiary hearing that began on

March 23, 2016, and continued on June 30, 2016—combined with the fact that the hearing involved not only Davion but his three older siblings who had already been adjudicated neglected and abused—created some confusion in this case. The court initially made an unfitness finding on June 30, 2016, but stated that it was uncomfortable procedurally doing so before conducting an adjudicatory hearing for Davion. The two-day hearing in this case, however, served as both an adjudicatory hearing for Davion and a fitness hearing for his siblings. As discussed at length above, the parties and the court knew that, with respect to Davion, the State sought termination of Traci's parental rights at Davion's dispositional hearing. Whenever such an expedited termination ruling is made, the evidence supporting a finding of unfitness is necessarily that evidence presented at the adjudicatory hearing. See 705 ILCS 405/2-21(5)(iii) (West 2014) (permitting expedited termination if the court finds the parent unfit "on the basis of clear and convincing evidence admitted at the adjudicatory hearing"). In such situations, the circuit court must consider the same evidence under two different standards; it must decide whether a preponderance of the evidence supports a finding of abuse, neglect, or dependency (705 ILCS 405/1-3(1), 2-18 (West 2014)) and, following a dispositional finding, must review the same evidence again to determine whether the parent's unfitness is established by clear and convincing evidence (705 ILCS 405/2-29(4) (West 2014)).

¶ 83    We agree with the State that, although the circuit court improperly stated its finding that Traci was unfit as to Davion before finding Davion abused and neglected, it corrected this error on the record and ultimately followed the correct procedure. The court concluded proceedings on June 30, 2016, by finding Davion abused and neglected. At the continued hearing on July 6, 2016, the court reiterated this finding, adjudicated Davion a ward of the court following a dispositional hearing, then took judicial notice of evidence introduced at the adjudicatory hearing

to again make a finding that Traci was an unfit parent under subsection (b) of section 1(D) of the Adoption Act, and, finally, received separate best interest evidence before terminating her parental rights.

¶ 84    The State is furthermore correct that, on its own, the court's premature finding of unfitness did not deprive Traci of any right. The Act establishes a bifurcated procedure for the termination of parental rights pursuant to which a finding of unfitness is only the first step. A further finding that termination is in the minor's best interest must also be made before parental rights are legally terminated. *In re Chilean D.*, 304 Ill. App. 3d 580, 583 (1999).

¶ 85    We additionally reject Traci's argument that, by the time the circuit court made its finding that Davion was a neglected and abused minor, "the harm had already been done" because the court was exposed to and may have been prejudiced by evidence of Traci's history of unsuccessful participation or lack of participation in services prior to Davion's birth. As discussed above, where the State pursued a theory of anticipatory neglect, this evidence was properly considered by the court at the adjudicatory stage. Indeed, as already noted, it is this same evidence that is used to establish unfitness, although that finding must be based on clear and convincing evidence.

¶ 86    Because we do not agree with Traci that the circuit court's premature finding of her unfitness had the effect of prematurely terminating her parental rights without the necessary findings and appropriate hearings, it is clear that she was not deprived of any right to due process.

¶ 87                                    D. Finding of Unfitness

¶ 88    Traci next argues that the circuit court's finding that she was unfit was against the manifest weight of the evidence. Section 1(D) of the Adoption Act lists the grounds pursuant to

which a parent may be found unfit for purposes of terminating parental rights. 750 ILCS 50/1(D) (West 2014). Although "any one ground, properly proven, is sufficient to enter a finding of unfitness" (emphasis omitted) (*In re C.W.*, 199 Ill. 2d 198, 217 (2002)), parental unfitness must be established by clear and convincing evidence (*In re J.G.*, 298 Ill. App. 3d 617, 627 (1998)). We will not set aside a circuit court's finding that there was clear and convincing evidence of Traci's unfitness unless that finding is against the manifest weight of the evidence. *In re A.P.*, 277 Ill. App. 3d 592, 598 (1996). Decisions rendered in other cases are of limited assistance, as "[e]ach case concerning parental fitness is *sui generis*, unique unto itself." *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990).

¶ 89    We first reject Traci's argument that the circuit court's finding that she was unfit must be vacated because the court improperly considered Davion's best interest at the unfitness stage. The bifurcated nature of termination proceedings calls for the court to make a determination regarding the parent's fitness first, without considering the child's best interests or the likelihood of eventual adoption. *In re Adoption of Burton*, 43 Ill. App. 3d 294, 302 (1976). Traci seizes on a single statement made by the court following its consideration of her progress with services in the time since Davion's birth, just before the court's premature finding that she was unfit as to Davion on June 30, 2016. The court stated "at the end of the day I have to do what I think is in the best interest of your children, all of them."

¶ 90    This isolated statement does not establishes that the circuit court improperly based its finding of unfitness—which it later clarified was made in Davion's case for the same reasons such findings were made with respect to his siblings—on considerations of Davion's best interests. The State argues that the statement was merely intended to echo the overarching principle that "[i]n any proceeding initiated pursuant to the Juvenile Court Act *** the

paramount consideration is the best interest of the child." (Internal quotation marks omitted.) *Arthur H.*, 212 Ill. 2d at 464. It could also be that the court was considering the relative fairness to Traci and to Davion of allowing expedited termination proceedings to continue, as supported by its statement: "Well, as much as I might think – and it bothers me in terms of a notion of fairness. The answer is no, we're not stopping this today." In any event, it remains an isolated remark.

¶ 91     In connection with Davion, the only ground for unfitness the State pursued was that articulated in subsection (b) of section 1(D) of the Adoption Act: the parent's "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2014). The language of this subsection is disjunctive. A court may properly base a finding of unfitness on a parent's failure to maintain a reasonable degree of interest *or* concern *or* responsibility for the child's welfare. *In re C.E.*, 406 Ill. App. 3d 97, 108 (2010).

¶ 92     Thus, it is not enough, as Traci argues, that she "always maintained a reasonable degree of interest, concern, *or* responsibility as to her children's welfare." (Emphasis added.) All three must have been present to avoid a finding of unfitness. Here, although Traci marshals some evidence that she maintained a reasonable degree of interest and concern for Davion, the circuit court expressly stated that its finding of unfitness was based solely on her failure to maintain a reasonable degree of responsibility for his welfare.

¶ 93     Citing DCFS visitation records, Traci notes certain instances in which she fed her children, changed their diapers, clothed them, played with them, and read them books. Ms. Jolly, who observed Traci with the children and interviewed caseworkers who regularly supervised the visits, however, testified that Traci was sarcastic and hostile with the children and that her low

cognitive functioning could prevent her from learning and applying positive parenting skills. Traci faults the court for focusing on her lack of progress with the services that were offered to her, rather than on this evidence of her "contact and care for her children." The reality of this case, however, is that even considering Traci's conduct in the context of the challenges she faced, including poverty and possible depression, the judge hearing this case had a basis for concluding that a "reasonable degree" of responsibility for Davion's care involved more than occasionally feeding him or changing his diaper at a supervised visit but instead should have encompassed regular visitation and efforts to remove the obstacles standing in the way of Traci assuming more responsibility for his care. The evidence in this case clearly established that Traci was unsuccessfully discharged from therapy on multiple occasions, was discharged from parent coaching for a lack of participation, and in over four years was never able to make the progress necessary to achieve unsupervised visitation with any of her children. That Traci "continued to reengage and make efforts" goes to her interest and concern for Davion but, without any progress, it does not demonstrate that she was able to assume a reasonable degree of responsibility for his care and well being or make the court's finding that the evidence clearly and convincingly showed that she was unfit against the manifest weight of the evidence.

¶ 94    In short, the circuit court's finding that the evidence clearly and convincingly demonstrated that Traci was unfit because she failed to maintain a reasonable degree of responsibility for Davion's well-being was not against the manifest weight of the evidence.

¶ 95                          E. Best Interests Determination

¶ 96    Finally, Traci argues that the circuit court's finding that termination of her parental rights was in Davion's best interest was against the manifest weight of the evidence. Even if she is unfit, Traci contends that her relationship with Davion, who is not yet two years old, should not

be severed because their visits demonstrate that the two share a natural bond. The public guardian and the State argue both that the circuit court properly applied the best interest factors established by the Juvenile Court Act and that those factors support the circuit court's decision.

¶ 97    Once a parent has been found unfit pursuant to one or more grounds set out in the Adoption Act (750 ILCS 50/1(D) (West 2014)), the State must establish by a preponderance of the evidence that it is in the minor's best interest to terminate parental rights. *In re D.T.*, 212 Ill. 2d 347, 367 (2004). The circuit court must consider all matters bearing on the child's welfare (*In re Violetta B.*, 210 Ill. App. 3d 521, 534 (1991)), including the following factors set out in section 1-3 of the Juvenile Court Act:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2014).

"Additionally, the court may consider the nature and length of the child's relationship with [the] present caretaker and the effect that a change in placement would have upon [the child's] emotional and psychological well-being." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. On review, we will reverse a circuit court's finding, which must be supported by a preponderance of the evidence, that termination of parental rights is in a minor's best interest only if it is against the manifest weight of the evidence. *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 65.

¶ 98    Traci cites *In re M.F.*, 326 Ill. App. 3d 1110, 1114-15 (2002), for the proposition that severing a child's relationship, even with an unfit parent, may not be in the child's best interest. The appellate court in that case reversed a termination finding with respect to the respondent mother's older child, who had been living with her father since her parents' divorce a number of years before. *Id.* at 1113, 1120. The mother had had regular visitation with the child since the

divorce, and the child expressed a desire to continue those visits. *Id.* at 1113, 1118. As there was no adoption to consider, the court concluded that termination would not improve the stability of the child's situation but would only serve to deprive the child of an established relationship with her mother. *Id.* at 1118.

¶ 99    In contrast, the court in *M.F.* also affirmed the termination of the mother's parental rights with respect to a second child, who was only nine months old when removed from the mother's care, who was not under the care of another parent, and for whom adoptive placement was available. *Id.* at 1116-17. Because the bond between the mother and the younger child "was not yet great" and "because the evidence indicate[d] it [wa]s highly unlikely [the mother] w[ould] ever be able to parent [the child] without a great deal of help and supervision" (*id.*), the court concluded that termination of parental rights was in the child's best interest. Because Davion's situation more closely resembles that of this younger child, this case supports the circuit court's order.

¶ 100 Although Traci asserts that her bond with one-year-old Davion should prevent the termination of her parental rights, the testimony she cites at most establishes that Traci sometimes fed Davion, soothed him when he was fussy, or changed his diaper, actions that must be taken by anyone caring for an infant. Even if a bond exists, we agree with the State that termination may still be proper if it would result in stability and permanency for the child, a goal that is clearly a primary concern of the Juvenile Court Act. 705 ILCS 405/1-2 (West 2014). In *In re Angela D.*, 2012 IL App (1st) 112887, ¶¶ 19-22, for example, the appellate court affirmed a circuit court's order terminating the respondent mother's parental rights even though all witnesses agreed that the mother's relationship with her children was a good one. *Id.* ¶¶ 37, 44. However, the children also had a good relationship with their foster parents, whom they

considered family. *Id.* ¶ 37. The foster parents had "demonstrated a commitment to meeting the needs of [the children] over the preceding two years" and had integrated the children into their community and extended family. *Id.* ¶ 38. The children's mother, by contrast, had never progressed beyond supervised visitation, despite receiving over five years of services. The court concluded that "any potential trauma" it was feared one of the children might face if contact with her mother "was discontinued was outweighed by the stability and support [the child] would unquestionably receive with her foster family." *Id.* ¶ 40.

¶ 101    As in *Angela D.*, the evidence presented in this case demonstrates that Davion has a clear bond with his foster mother. And, as in *Angela D.*, the foster parent in this case is "in the best position to maintain and nurture th[at] bond." *Id.* ¶ 37. Although there is no guarantee of future contact with a biological parent once an adoption is finalized, the record in *Angela D.* indicated, as the record does here, that the foster parent(s) would allow continued contact if it was in the children's best interest. *Id.* ¶ 41.

¶ 102    Traci's contention that long-term foster care or some guardianship arrangement short of adoption would be preferable to the termination of her parental rights has been rejected by this court. See, *e.g.*, *Tajannah O.*, 2014 IL App (1st) 133119, ¶¶ 16, 28, 33 (affirming the circuit court's termination of parental rights, even where the mother and the child enjoyed an "extraordinary" bond and had "almost daily contact," but where the child was thriving with her foster family and permanency was a "necessity"). By making alternative placement options available only "for children for whom the permanency goals of return home and adoption have been ruled out," the Juvenile Court Act establishes a clear preference for permanency and stability. 705 ILCS 405/2-27(1)(a-5) (West 2014).

¶ 103    At the best interest phase, "the child's best interest takes precedence over any other

consideration." *Tajannah O.*, 2014 IL App (1st) 133119, ¶ 18. With this overarching principle in mind, we cannot say that the circuit court's decision to terminate Traci's parental rights and appoint a guardian with the right to consent to Davion's adoption was against the manifest weight of the evidence.

¶ 104                              CONCLUSION

¶ 105   For the foregoing reasons, we affirm the circuit court's orders adjudicating Davion N. a neglected and abused minor; finding his natural mother, Traci F., an unfit person as defined by the Adoption Act; and finding it appropriate under the Juvenile Court Act to terminate Traci's parental rights at the dispositional hearing and appoint a guardian with the right to consent to Davion's adoption.

¶ 106   Affirmed.