2022 IL App (1st) 220403-U

THIRD DIVISION
September 14, 2022

No. 1-22-0403

**NOTICE:** This order was filed under Supreme Court Rule 23 is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| In re L.L., K.L., E.L., and G.L., Minors, | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County. |
| (The People of the State of Illinois, | ) | |
| | ) | Nos. 17 JA 388 |
| Petitioner-Appellee, | ) | 18 JA 723 |
| | ) | 19 JA 1079 |
| v. | ) | 20 JA 1436 |
| | ) | |
| A.A., | ) | |
| | ) | Honorable |
| Respondent-Appellant). | ) | Patrick Murphy, |
| | ) | Judge Presiding. |

_____

PRESIDING JUSTICE McBRIDE delivered the judgment of the court.
Justices Gordon and Burke concurred in the judgment.

**ORDER**

¶ 1     *Held*:    The trial court's order terminating respondent mother A.A.'s parental rights as to her minor children is affirmed where (1) the trial court's finding of parental unfitness was not against the manifest weight of the evidence and (2) the termination of her parental rights was in the best interests of the minors.

¶ 2     Respondent A.A. appeals the trial court's order to terminate her parental rights to the minors, L.L., K.L., E.L., and G.L., finding her unfit to parent for failure to protect the children.

Respondent argues that: (1) the trial court's finding of parental unfitness is against the manifest weight of the evidence, and (2) the trial court's determination that it was in the best interest of the minors to terminate their mother's parental rights was against the manifest weight of the evidence.

¶ 3     L.L. was born on March 31, 2017, K.L. was born on July 27, 2018, E.L. was born on September 21, 2019, and G.L. was born on September 5, 2020. Respondent and B.L.[1] are the parents of all minor children.

¶ 4     On April 28, 2017, the State filed a petition for adjudication of wardship for L.L., a male child born on March 31, 2017. The petition alleged that he was neglected under the Juvenile Court Act of 1987 (Juvenile Court Act) due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2016)) and abused under the act because a person in the household creates a substantial risk of physical injury to such minor by other than accidental means (*id.* § 2-3(2)(ii)). The supporting facts for both allegations stated:

> "Mother is currently a youth in care and is inconsistent with services. Mother is being offered parenting, individual therapy, domestic violence and mental health services. Mother has mental [health] diagnoses and requires psychiatric services. Mother often elopes from her placement and takes this minor to putative father's home. There is a history of domestic violence between parents. Putative father has failed to make himself available to be assessed for services."

¶ 5     The trial court entered an adjudication order for L.L. on March 27, 2018, finding that L.L. had been abused or neglected due to an injurious environment and a substantial risk of physical injury. The order stated that respondent was a youth in care and that services were

---

[1] B.L. is not a party to this appeal. His parental rights to all of the minors were terminated and affirmed on appeal. See *In re L.L., K.L., E.L., and G.L.*, Appeal No. 1-22-0416 (filed Aug. 31, 2022).

offered to her, but she was noncompliant. Respondent admitted a history of domestic violence with B.L. but minimized the domestic violence in their ongoing relationship. The court further found both parents were not cooperative with offers to ensure the safety of the minor, and respondent had judgment issues and was deemed to be a flight risk. On June 13, 2018, the court entered a disposition order adjudging L.L. a ward of the court and found respondent and B.L. were unable to care for L.L. The order indicated that reasonable efforts had been made to prevent or eliminate the need to remove L.L. from the home but were unsuccessful.

¶ 6    The August 2018 family service plan stated that respondent was a youth in care with Department of Children and Family Services (DCFS) and had multiple placements within her family and outside her family, but she ran away from each placement. Respondent had not complied with recommended services and was placed under a safety plan with L.L., but she violated the plan by taking her son to the home of B.L., who was alleged to be a gang member, and there were reports of domestic violence between respondent and B.L.

¶ 7    On August 2, 2018, the State filed a petition for adjudication of wardship for K.L., a female child born on July 27, 2018. The petition alleged that she was neglected under the Juvenile Court Act due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2016)) and abused under the act because a person in the household creates a substantial risk of physical injury to such minor by other than accidental means (*id.* § 2-3(2)(ii)). The supporting facts for both allegations stated:

> "Mother has one prior indicated report for substantial risk of physical
>
> injury/environment injurious to health and welfare by neglect. Parents have one
>
> other minor who is in DCFS custody with findings of abuse and neglect having
>
> been entered. Offered and recommended reunification services are on-going for

mother. Putative father is non-compliant with services. Mother has been diagnosed [with] major depressive disorder and post-traumatic stress disorder. There is a history of domestic violence between parents."

¶ 8    The trial court entered an adjudication order for K.L. on November 26, 2018, finding that K.L. had been abused or neglected due to an injurious environment and a substantial risk of physical injury. The order stated to see the transcript from the hearing for the court's findings, but the report of proceedings does not include this hearing. The parties entered an agreed stipulation of facts. The stipulation stated that respondent "was inconsistent with the services put in place to address the conditions that caused the removal of her son" L.L. There had been an "ongoing issue of domestic violence" between respondent and B.L. On March 6, 2018, B.L. "began punching mom about the face and body. At the time, mom was four months pregnant with [K.L.] and sustained bruises to her face and arms." A DCFS child protection investigator, if called to testify, would state that she met with respondent and that L.L. resided with his maternal aunt with respondent having supervised visits at her aunt's home and was allowed to see L.L. daily. Respondent was involved in individual therapy, domestic violence classes, and had a parenting coach. Respondent admitted to marijuana use prior to becoming pregnant. She also previously took Lithium for depression but had not taken the medication since 2015 because she no longer needed it. K.L. was taken into protective custody because respondent had been inconsistent with services, and she had run away from her teen living program.

¶ 9    On the same date, the court entered a disposition order adjudging K.L. a ward of the court and found respondent and B.L. were unable to care for K.L. The order indicated that reasonable efforts had been made to prevent or eliminate the need to remove K.L. from the home but were unsuccessful. A February 2019 permanency order for L.L. and K.L. indicated the appropriate

permanency goal was to return home within five months because services were ongoing. In July 2019, respondent and B.L. were granted unsupervised day and overnight visits at the home of the paternal grandmother. The November 2019 permanency order allowed supervised visitation at the home of the paternal grandmother and also listed the goal of return home in five months.

¶ 10     On September 28, 2019, the State filed a petition for adjudication of wardship for E.L., a male child born on September 21, 2019. The petition alleged that he was neglected under the Juvenile Court Act due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2018)) and abused under the act because a person in the household creates a substantial risk of physical injury to such minor by other than accidental means (*id.* § 2-3(2)(ii)). The supporting facts for both allegations stated:

> "Mother has two prior indicated reports for substantial risk of physical injury/environment injurious to health and welfare by neglect. Parents have three other minors who are in DCFS custody with findings having been entered. On September 21, 2019 mother presented at the emergency room by ambulance due to a domestic altercation between her and father. Mother was observed to have a busted, swollen lip and bruises. Mother went into labor with this minor while she was at the hospital being treated for her injuries. Parents need to be reassessed for services due to this recent incident of domestic violence. Parents reside together."

¶ 11     On January 3, 2020, the trial court entered an adjudication order for E.L. and found he was neglected due to an injurious environment and abused due to a substantial risk of physical injury, the order points to the exhibits entered into evidence and the transcript of the hearing, which are not part of the record on appeal. The same day, the trial court conducted the dispositional hearing and found both parents unable to care for E.L. and the minor was adjudged

a ward of the court. Also in January 2020, the court ordered that the parents were not to visit the minors at the same time.

¶ 12    In February 2020, a goal of return home in 12 months was entered for E.L., finding that both parents had not made substantial progress towards the return home of the minor and noting that parents "must engage in further services." In October 2020, a permanency goal of return home within five months was set for L.L. and K.L. and noted that "parents need to make progress in services."

¶ 13    On October 15, 2020, the State filed a petition for adjudication of wardship for G.L., a male child born on September 5, 2020. The petition alleged that he was neglected under the Juvenile Court Act due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2018)) and abused under the act because a person in the household creates a substantial risk of physical injury to such minor by other than accidental means (*id.* § 2-3(2)(ii)). The supporting facts for both allegations stated:

> "Mother and putative have three other minors under the guardianship of the [DCFS] with findings of abuse and neglect having been entered. During a visit with those children on or about December 11, 2019, mother and father were involved in a domestic violence incident in which mother was struck about the body with implements. Mother is a ward of the court and is currently residing with putative father outside her authorized placement. Mother and putative father have not made progress in services recommended to aid in reunification with minor's siblings."

¶ 14     In February 2021, the permanency orders entered for L.L., K.L., and E.L. changed the permanency goal to substitute care pending court determination on termination of parental rights. The reason for this change was "parents have not made sufficient progress towards return home."

¶ 15     On March 26, 2021, the trial court entered an adjudication order for G.L. finding him to neglected due to an injurious environment and abused based on a substantial risk of injury. The reason stated in the order was "siblings in DCFS care for up to 4 years, mother/father Dec. 2019 domestic violence, unrebutted young parents, ongoing need for services, not attending court." The dispositional hearing was also conducted that day and the court found both parents unable to care for G.L. and the minor was adjudged a ward of the court. A permanency order for G.L. was also entered with a permanency goal of return home pending a status hearing with parents not making substantial progress. In November 2021, the permanency goal for G.L. was changed to substitute care pending court determination on termination of parental rights.

¶ 16     On January 24, 2022, the State filed petitions for each of the minors to permanently terminate parental rights and to appoint a guardian with the right to consent to adoption. The petitions alleged that the parents had failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare in violation of section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2020)) and section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29 (West 2020)) and that they had failed to make reasonable efforts to correct the conditions which were the basis for the removal of the children under section 1(D)(m) (750 ILCS 50/1(D)(m) (West 2020)) and section 2-29 (705 ILCS 405/2-29 (West 2020)). The petitions further alleged that it was in the best interests of the minors that a guardian be appointed with the right to consent to adoption where the children had been living with their foster parents for an

extended period of time, the foster parents desired to adopt the minors, and the adoption was in the best interests of the children.

¶ 17    On March 9, 2022, the trial court conducted the termination hearing with testimony regarding parental unfitness presented first. The State detailed the previous findings of neglect and the adjudication of wardship for each minor. The State also set forth the nine-month period to consider for termination for each minor. For L.L., a basis for termination Grounds (b) and (m) during the nine-month periods of March 27, 2018, through December 27, 2018, and December 29, 2019, through September 28, 2020, and May 8, 2020, through February 8, 2021. For K.L., grounds (b) and (m) were alleged with nine-month periods of time from November 26, 2018, through August 26, 2019, and August 27, 2019, through May 27, 2020, and May 8, 2020, through February 8, 2021. The nine-month periods for E.L. were from January 3, 2020, through October 3, 2020, and May 8, 2020, through February 8, 2021, under the same grounds. The nine-month periods of time for G.L. were March 26, 2021, through December 26, 2021, based on the same grounds for termination.

¶ 18    Lacrecia Long, a case manager for Universal Family Connection, testified at the hearing that she was assigned to the minors' cases. As of September 2020, she was servicing all four children. Respondent's contact information was not reliable, and respondent called her from different telephone numbers. Respondent has not been employed through the duration of the case.

¶ 19    When she was first assigned, she provided reunification services for respondent which required respondent to complete individual therapy, drug treatment, a mental health assessment, domestic violence classes, and parenting classes. Long made referrals for all of these services for respondent. Respondent was rated unsatisfactory for the individual therapy, domestic violence

classes, and drug treatment. Long spoke with respondent about respondent's interest in complying with the services, but there was never any follow through. According to Long, there was never a recommendation for unsupervised visits for respondent because respondent "was not involved in the services, nor making herself available to the agency for us to staff some type of visitation to be assessed for unsupervised." Long "re-referred" respondent to multiple services, but there was always "some kind of disconnect," such as, respondent did not get the information in the mail, she did not get the e-mail from the service provider, or no one contacted her. Respondent did complete an individual therapy service in June 2019, as well as a psychiatric consultation in September 2019 and no medication was prescribed. Respondent also completed a nurturing parenting program in June 2020. Long never observed respondent to be under the influence of drugs.

¶ 20    During supervised visits, respondent was often supervised by family members while Long supervised a couple of visits. She found the visits "safe and appropriate." Respondent called Long on occasion and asked about the wellbeing of the children, but never sent gifts, cards, letters, or similar items for the children. Long asked respondent for documents showing respondent's engagement in services for reunification, but although respondent said she had these documents, Long never received them. Long needed the certificates from the referred services to prove that respondent had finished the services.

¶ 21    Long also discussed the parents' history of domestic violence and their intention for reunification as a couple. They were referred for couple's counseling around the end of 2019 to early 2020, but they did not want to be engaged in couple's counseling. Respondent told Long that she wanted to focus on herself but continued in her relationship with B.L.

¶ 22    The goal changed to a recommendation for the termination of parental rights in 2021

because the case had been ongoing since 2018 and there had been no substantial progress towards reunification by either parent. Long testified that it was "time to find some permanency for the children." The agency did not consider refraining from pursuing termination for G.L., as the youngest, because no progress had been made from his birth until the change in the goal.

¶ 23    The State asked the court to take judicial notice of L.L.'s adjudication order from March 2018, including statements that respondent was a youth in care, was noncompliant, minimized the domestic violence, and was a flight risk after running away from her housing. The State also requested that judicial notice be taken of G.L.'s adjudication from March 2021, which noted the ongoing services for the siblings and domestic violence between the parents. Finally, the State requested judicial notice be taken of a January 2020 order that the parents were not to visit the minors at the same time. The State asked to admit three service plans from 2019, 2020, and 2021 into evidence.

¶ 24    In the first service plan, dated April 1, 2019, the permanency goal for L.L. and K.L. was to return home within 12 months, with the planned achievement date of October 31, 2019. The plan noted that respondent and B.L. were engaging consistently in services. Respondent was able to continue to receive services and remain at the teen living program (TLP) with UCAN, but she was inconsistent in complying with the TLP. The identified needs were compliance with placement, and she needed to agree to maintain contact with foster parent prior to visits and doctor appointments. Respondent had begun engaging with domestic violence services.

¶ 25    The second service plan was dated October 2, 2020, and now included E.L. as well as the older children. In the summary since the last review, respondent was not consistent with TLP and needed to be referred for domestic violence services, individual therapy, and the nurturing parenting program. Respondent resided at the TLP, but had been missing from there and staying

with B.L. since December 24, 2019. The court-set permanency goal continued to be return home within 12 months, but the evaluation of progress towards that goal was unsatisfactory. Respondent and B.L. were not engaging consistently in the recommended services. Respondent was not compliant with outstanding services, but she had completed her psychiatric evaluation. The psychiatric recommendation was to maintain therapy, but respondent was not compliant. Respondent was also not compliant in receiving domestic violence services, but had agreed to start domestic violence services.

¶ 26    The third service plan was dated October 4, 2021, and now included G.L. The summary of the family's progress stated that respondent was reported to be six months pregnant, and she had been referred to domestic violence services, individual therapy, and the nurturing parenting program. Neither respondent nor B.L. were working. The court set permanency goal was substitute care pending court determination on termination of parental rights. The stated reason for this goal was because "natural parents had a very long time to correct the conditions that brought the case to DCFS attention [and] they have [been] reluctant to do so." For G.L., the permanency goal was return home within 12 months, but the evaluation of the goal progress was unsatisfactory. Respondent and B.L. were not engaging consistently in recommended services at that time. Respondent was not compliant with outstanding services. She had not been in communication with foster parents and was rated unsatisfactory on this progress. Respondent was inconsistent in complying with TLP and was not currently in placement. The psychiatric recommendation was again to maintain therapy, but respondent was not then engaging in services. Respondent was also not engaging in the domestic violence services.

¶ 27    The State, the Guardian, and respondent then rested.

¶ 28    B.L. testified that he completed domestic violence classes in April 2019. He stated that he

was never given a referral for individual therapy. He asked for referrals for services, but the caseworker was never available. He testified that he "completed everything that was recommended. As long as they gave me the time and place, [he] was there to finish it." According to B.L., Long's testimony was "false" because he "would have completed everything she gave me" and he "would have completed any task for my kids," but he was not "given the opportunity because they never told me where to go and at what time." B.L. never brought up the issue regarding lack of referrals to the judge during the dozen court dates they have had since 2020 because he had "trust in Ms. Long" that she could give him "the services so [he] could complete them." He believed it was the agency's fault that the case had been in the system so long because Long "would never give us anything to do. She would just call us and *** ask about visits and stuff like that." Long would tell them that they needed to do these services, but "she never gave us a time and place to do it."

¶ 29    Respondent presented a certificate of completion for individual counseling services at Metropolitan Family Services, dated June 3, 2019, and a certificate awarded to her for successfully completing the Nurturing Parenting Program at Lutheran Child and Family Services of Illinois, dated June 13, 2019, as exhibits, which the trial court admitted. B.L. presented a certificate of completion for a 26-week domestic violence class at Universal Family Connection as an exhibit, which the trial court admitted.

¶ 30    Following arguments by the parties, the trial court found that State had proven both grounds for parental unfitness by clear and convincing evidence. The court detailed its findings as follows.

> "When this case first came in 2017, I believe the record will show that I
> bent over backwards for the parents. Primarily because the mother was a Ward of

12

the Court and for the first child and even for the second. But, over the course of this case, neither parents ever reached a situation where they could visit the children unsupervised. And I continually pushed for that.

Services sporadic, in and out, in and out. Promises to separate and then back together and domestic violence, another child. More domestic violence. And to blame the agency. You know, in my experience, a caring parent would walk over a mountain of cut glass barefoot to get his or her child back. And in this case, I don't see it. I see two parents who are very, very immature. And I think they are both very satisfied in having relatives raise the kids where they can come in every week or two or three or four and visit and wave to the kids and pick up the kids and be a nice kindly uncle or aunt type person."

¶ 31    The parties then proceeded to the best interest portion of the hearing. Long provided testimony related to the best interests of the children.

¶ 32    L.L., K.L., and E.L. are all placed in a relative placement with a maternal great aunt A.T. The court asked if it was correct that A.T. was a police officer and lived near her mother who assisted with the children, and Long confirmed that was correct. The children have been placed with A.T. for around four years as the children entered the system. Long observed them in January 2022 and found the placement to be safe and appropriate. There were no signs of abuse or neglect or risk of harm. L.L., K.L., and E.L. are bonded with A.T. and none of the children have any special needs or developmental concerns. Long stated that it would be in their best interest to remain together as a sibling unit. A.T.'s mother lives with them as well and everyone gets along "great."

¶ 33    Long testified that G.L. was placed with a paternal relative since he was born. She

observed G.L. in his placement in January 2022 and it was safe and appropriate with no signs of abuse or neglect or risk of harm. There are no developmental concerns for G.L. The foster home also has children under the age of 13 as well as the foster mother's older daughter. The siblings see each other "frequently," and the children want to see each other more.

¶ 34     Both foster parents have signed a permanency commitment and have not changed their minds. The agency is recommending that the parental rights of all minors be permanently terminated with the court to appoint a guardian of all four children with the right to consent to their adoption. The foster parents are the prospective adoptive homes. Long was never directly told by A.T. that she might move to Texas.

¶ 35     X.G. testified with the assistance of a Spanish interpreter. She is G.L.'s aunt and she would like to adopt G.L. because she has had him since he was five days old.

¶ 36     The State rested after X.G.'s testimony.

¶ 37     Respondent testified that A.T. told her earlier in 2022 that she was going to move to Texas. Respondent has a bond with her children and she would like to play a role in her children's life. Respondent believed that the services she engaged in helped her to become a better parent by teaching her things she did not know. She did not agree that her parental rights should be terminated and it is "unfair" because she did not get to voice her opinion. She asserted that while "it might not be enough progress for you. But it's an amount of progress for [her]." She has "changed so much" and "learned so much." Her goal is to be there for her kids and to protect them, provide for them, and nurture them. She testified that her children were "traumatized" and cry when their visits end.

¶ 38     B.L. also testified that he did not believe it was in the children's best interest to terminate his parental rights because the children have "already had enough" and the children "just want to

be with us" and they "cry when it's time for them to go back."

¶ 39    At the end of the hearing, the trial court found that it was "clearly in the best interest to terminate rights" and appointed a guardian with the right place the children. Termination hearing orders were entered for each child on March 9, 2022, finding that respondent was unfit by clear and convincing evidence and it was in the best interests of the children to terminate respondent's parental rights.

¶ 40    This appeal followed. A.A. filed timely a notice of appeal on March 18, 2022, listing the order terminating her parental rights for L.L., K.L., E.L., and G.L. Accordingly, this court has jurisdiction for respondent's appeal under Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994).

¶ 41    Respondent first argues that the trial court erred when it found her unfit to parent because she had made both reasonable efforts and reasonable progress toward the reunification with her children. Specifically, respondent contends that she has made reasonable efforts because the main allegation for wardship was domestic violence, but there was insufficient evidence of domestic violence presented at the hearing. She further asserts that she has made reasonable progress based on her completion of two courses, visiting the children, the lack of allegations related to her use of drugs or alcohol, and the psychological assessment indicated that she did not require ongoing mental health treatment. Respondent also argues that there was insufficient evidence to suggest she had lost interest, concern, or responsibility toward her children. The State maintains that the evidence at the parental unfitness hearing demonstrated respondent's failure to progress in services and her inability to proceed to unsupervised visits with her children after more than four years in the system.

¶ 42    " 'In Illinois, the authority to involuntarily terminate parental rights is purely statutory and the scope of the court's authority is defined by the Juvenile Court Act and the Adoption

15

Act.' " *In re M.I.*, 2016 IL 120232, ¶ 19 (quoting *In re E.B.*, 231 Ill. 2d 459, 463 (2008)).

"Illinois policy 'favors parents' superior right to the custody of their own children.' " *Id.*

(quoting *In re E.B.*, 231 Ill. 2d at 464).

¶ 43    The termination of parental rights is a two-step process. First, the State must prove by clear and convincing evidence that the parent is "unfit" as defined by section 1(D) of the Adoption Act. 750 ILCS 50/1(D) (West 2016); 705 ILCS 405/2-29(2) (West 2016). "Parental unfitness must be proven by clear and convincing evidence." *In re Adoption of K.B.D.*, 2012 IL App (1st) 121558, ¶ 196. " 'A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence.' " *Id.* (quoting *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005)). Second, "[a]ssuming the parent is found unfit, the circuit court must then consider whether it is in the best interests of the children to terminate parental rights." *In re J.B.*, 2014 IL App (1st) 140773, ¶ 49. " 'When ruling on parental unfitness, a court is not to consider the child's "best interests." ' " *In re M.I.*, 2016 IL 120232, ¶ 20 (quoting *In re Adoption of Syck*, 138 Ill. 2d 255, 276 (1990)). Each case concerning parental unfitness is considered *sui generis* and is decided on its own facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). "A court may not terminate a parent's rights on grounds not charged in the petition.  At the same time, however, the State is not required to prove every ground it has alleged for finding a parent unfit." *Id.* at 349.

¶ 44    "On appellate review, this court 'will not disturb a finding of unfitness unless it is contrary to the manifest weight of the evidence and the record clearly demonstrates that the opposite result was proper.' " *Id.* (quoting *In re Konstantinos H.*, 387 Ill. App. 3d 192, 203 (2008)). "We give great deference to the trial court's finding of unfitness, defer to the trial court's factual findings and credibility assessments, and will not re-weigh the evidence anew on

16

appeal." *Id.* This court will only find the trial court's ruling to be against the manifest weight of the evidence when the opposite conclusion is clearly evident from a review of the evidence presented. *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 25.

¶ 45    The termination petitions for each of the minors alleged that respondent was unfit under sections 1(D)(b) and 1(D)(m) of the Adoption Act. At the conclusion of the unfitness hearing, the trial court found respondent unfit under both grounds. "It is well established that a failure to comply with an imposed service plan and infrequent or irregular visitation with the child may support a finding of unfitness under both sections (b) and (m)." *In re Jeanette L.*, 2017 IL App (1st) 161944, ¶ 18.

¶ 46    Under section 1(D)(m), the petitions alleged that respondent failed

> "to make reasonable efforts to correct the conditions which were the basis for the removal of the child from them and/or have failed to make reasonable progress toward the return of the child to them within 9 months after the adjudication of neglect or abuse under the Juvenile Court Act, or after an adjudication of dependency under the Juvenile Court Act, and/or within any 9 month period after said finding." See 750 ILCS 50/1(D)(m) (West 2020).

¶ 47    The grounds for unfitness set forth in section 1(D)(m) of the Adoption Act are phrased in the disjunctive. *In re C.N.*, 196 Ill. 2d 181, 210 (2001). "Thus, section 1(D)(m) provides two independent bases for a finding of unfitness: (1) the failure by a parent to make reasonable efforts to correct the conditions that were the basis for the removal of the child, *or* (2) the failure to make reasonable progress toward the return of the child." *Id*. at 210-11.

¶ 48    Reasonable efforts relate to the goal of correcting the conditions that caused the removal of the child from the parent. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24. "The reasonable efforts

inquiry is a subjective one, focusing on the efforts of the parent that would be reasonable for that parent under the circumstances." *In re J.O.*, 2021 IL App (3d) 210248, ¶ 51. "The inquiry is narrow, as it considers only the correction of those conditions originally providing the basis for removal of the children." *Id.*

¶ 49    "Whether a parent has made reasonable progress 'is judged by an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent.' " *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 62 (quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006)). Progress is considered in light of both the circumstances that gave rise to the original loss of custody as well as any other conditions that later become known. *In re J.O.*, 2021 IL App (3d) 210248, ¶ 57. At minimum, reasonable progress necessitates measurable or demonstrable movement toward the goal of reunification. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 62. Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future. *Id.*

¶ 50    Termination under section 1(D)(m) contains a timeframe limitation (750 ILCS 50/1(D)(m) (West 2020)), and thus in this section, we narrow our examination of respondent's progress towards reunification, including aspects such as her service plan and regularity of visitation, within the nine-month periods set forth by the State. As stated above, the State set forth the following nine-month periods for each of the minors. For L.L., a basis for termination under ground (m) was during the nine-month periods of March 27, 2018, through December 27, 2018, and December 29, 2019, through September 28, 2020, and May 8, 2020, through February 8, 2021. For K.L., ground (m) was alleged with nine-month periods of time from November 26, 2018, through August 26, 2019, and August 27, 2019, through May 27, 2020, and May 8, 2020, through February 8, 2021. The nine-month periods for E.L. were from January 3, 2020, through

October 3, 2020, and May 8, 2020, through February 8, 2021, under the same grounds. The nine-month periods of time for G.L. were March 26, 2021, through December 26, 2021, based on the same grounds for termination.

¶ 51    Respondent contends that she has made reasonable efforts and reasonable progress because there was minimal evidence of domestic violence after G.L. was placed into wardship, she visits the children, and she completed the nurturing parenting program and the individual counseling. However, the evidence presented at the unfitness hearing detailed an ongoing issue of domestic violence and a failure to engage in the services and make progress as set forth in the service plans.

¶ 52    The reasonable efforts and reasonable progress grounds are based on respondent's actions to correct the conditions that led to the removal of the minors from her care. Contrary to her argument, the record does not show that she made a reasonable effort to reunify with her children. She continued her relationship with B.L. and failed to engage in the domestic violence services as set forth in all three service plans. Respondent's argument regarding reasonable progress fails to demonstrate any measurable progress beyond the completion of two services, while the service plans from 2020 and 2021 show her inconsistent and noncompliant progress, including running away from her placement, and a lack of communication.

¶ 53    As the service plans observed, respondent had a very long time to progress in services beginning when L.L. was a baby. DCFS became involved when L.L. was first removed from respondent's care in 2017 and continued annually as respondent gave birth to each of the additional minors. L.L.'s petition for adjudication of wardship alleged that respondent was a "youth in care" and often ran from her placement to go to B.L.'s home. She was "inconsistent" with services and there was a history of domestic violence. The allegations of domestic violence

and the need for ongoing DCFS services continued in the subsequent petitions for K.L., E.L., and G.L. In the stipulated facts for K.L.'s adjudication hearing, respondent admitted to the ongoing issue of domestic violence, including an incident from March 2018, in which B.L. "began punching" respondent about the face and body while she was four months pregnant with K.L. She sustained bruises to her face and arms. E.L.'s petition stated that on September 21, 2019, respondent presented at the emergency room after a "domestic altercation" between her and B.L. Respondent was observed to have a "busted, swollen lip and bruises," and she then went into labor with E.L. while at the hospital being treated for these injuries. The petition stated that respondent and B.L. needed to be reassessed for services following this incident of domestic violence. G.L.'s petition alleged further domestic violence in December 2019 in which respondent was struck about the body with implements and that respondent had not made progress in recommended services.

¶ 54     At the hearing, the caseworker Long testified that she referred respondent to the required services, including individual therapy, drug treatment, a mental health assessment, domestic violence classes, and parenting classes, but respondent was rated unsatisfactory for the individual therapy, domestic violence classes, and drug treatment. Long discussed with respondent about respondent's interest in complying with the services, but respondent failed to follow through. According to Long, there was never a recommendation for unsupervised visits for respondent because respondent "was not involved in the services, nor making herself available to the agency for us to staff some type of visitation to be assessed for unsupervised." Long noted that respondent did complete an individual therapy service in June 2019, a psychiatric consultation in September 2019, and a nurturing parenting program in June 2020. Long referred respondent and B.L. to couple's counseling to help with reunification as a couple, but they failed to participate.

As discussed, the three service plans admitted into evidence showed that respondent failed to make any consistent progress towards reunification. The service plans from 2020 and 2021 found that she was not compliant, not engaged in services, and had run away from her placement at TLP.

¶ 55    Further, while a July 2019 order granted respondent and B.L. unsupervised day and overnight visits at the home of the paternal grandmother, the November 2019 permanency order returned to supervised visitation at the home of the paternal grandmother. In January 2020, the court entered an order requiring respondent and B.L. were not to visit the minors at the same time. In the five years this case was in the system, unsupervised visitation was never again recommended for respondent. This does not reflect progress towards reunification during any of the nine-month timeframes set forth for each of the minors. Based on the evidence presented, we cannot say the trial court's finding of unfitness on these grounds was against the manifest weight of the evidence.

¶ 56    However, even if this finding was in error, which we do not find, the trial court also found respondent unfit under section 1(D)(b) of the Adoption Act. 750 ILCS 50/1(D)(b) (West 2020). Under section 1(D)(b), the petitions alleged that respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare. *Id.*

¶ 57    Because the language of section 1(D)(b) is in the disjunctive, any of the three elements may be considered on its own as a sufficient basis for unfitness. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 49. A finding of unfitness under ground (b) is based on a subjective analysis. *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24. "This ground does not focus on the parent's success but, rather, the reasonableness of her efforts and takes into account the parent's difficulties and circumstances." *Id.* "However, simply because a parent demonstrates some

21

interest or affection toward her child does not render her fit under this ground; rather, her interest, concern, and/or responsibility must be reasonable." *Id.* " '[N]oncompliance with an imposed service plan, a continued addiction to drugs, a repeated failure to obtain treatment for an addiction, and infrequent or irregular visitation with the child have all been held to be sufficient evidence warranting a finding of unfitness under [ground] (b).' " *Id.* (quoting *Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004)).

¶ 58 Respondent contends that "there is very little, if anything, in the record to suggest" that she had lost interest, concern, or responsibility for her children. She argues that the record showed that she made ongoing and continuous efforts to visit her children and she completed two of the recommended services. She admits that Long testified that respondent's visits were sporadic at times, but asserts that Long failed to provide those time periods. The State responds that although respondent showed an interest in her children, "her inability to change the domestic violence afflicting her life, comply with required services, and regularly visit the children showed a lack of parental responsibility."

¶ 59 In his ruling, the trial judge observed that he

> "bent over backwards for the parents. Primarily because the mother was a Ward
> of the Court and for the first child and even for the second. But, over the course of
> this case, neither parents ever reached a situation where they could visit the
> children unsupervised. And I continually pushed for that."

The judge found that respondent's participation in services was sporadic, she would return to B.L. and an incident of domestic violence would occur, and then another child was born. The judge found respondent and B.L. to be "very, very immature."

¶ 60 As thoroughly discussed above, respondent failed to comply with the services plans, she

continued in a relationship with B.L. despite repeated instances of domestic violence, including one that led to E.L.'s birth, and never engaged in services sufficient for unsupervised visitation or reunification. Rather than improving as her case continued in the system, respondent regressed with less compliance, communication, and visitation. She repeatedly ran away from her TLP placement to live with B.L. Respondent's argument that she visited her children is insufficient to demonstrate a reasonable degree of interest, concern, or responsibility. Based upon our thorough review of the record, we cannot conclude that the trial court's decision finding respondent unfit for her failure to maintain a reasonable degree of interest, concern, or responsibility for the minors' welfare was against the manifest weight of the evidence.

¶ 61    Next, we consider respondent's argument that the trial court's determination that it was in the best interest of the children to terminate her parental rights was against the manifest weight of the evidence.

¶ 62    "Once a parent has been found unfit pursuant to one or more grounds set out in the Adoption Act (750 ILCS 50/1(D) (West 2016)), the State must establish by a preponderance of the evidence that it is in the minor's best interest to terminate parental rights." *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 97. Following an unfitness finding, the trial court focuses on the needs of the child in determining whether the parental rights should be terminated. *In re J.V.*, 2018 IL App (1st) 171766, ¶ 249. "In determining the best interests of a child, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* " 'A child's best interest is superior to all other factors, including the interests of the biological parents.' " *Id.* (quoting *In re Curtis W.*, 2015 IL App (1st) 143860, ¶ 52).

¶ 63    In determining the best interest of a child under the Juvenile Court Act, the following factors shall be considered in the context of the child's age and developmental needs: (1) the physical safety and welfare of the child, including food, shelter, health, and clothing; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including (i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued), (ii) the child's sense of security, (iii) the child's sense of familiarity, (iv) continuity of affection for the child, and (v) the least disruptive placement alternative for the child; (5) the child's wishes and longterm goals; (6) the child's community ties, including church, school, and friends; (7) the child's need for permanence, which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2020).

¶ 64    "Additionally, the court may consider the nature and length of the child's relationship with her present caretaker and the effect that a change in placement would have upon her emotional and psychological well-being." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. The court's best interest determination need not contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision. *Id.* We will reverse the trial court's finding that termination of parental rights is in a minor's best interest only if it is against the manifest weight of the evidence. *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 97.

¶ 65    Respondent offers only a brief argument regarding why it was not in the children's best

24

interests to terminate her parental rights. She asserts that although Long testified that the placements of the children were safe and appropriate, there "was testimony that if an adoption was allowed to go forward, the children would presumably be split up once [A.T.] moved to Texas," citing her own testimony. She also pointed to her own testimony that "the children were calling her mommy" and that she "believed terminating their relationship with her would be traumatizing to them."

¶ 66     However, the evidence at the best interest clearly established that the minors were safe and bonded to their foster parents, who wished to adopt the children. Long testified that L.L., K.L., and E.L. are placed together with a maternal great aunt A.T., who is a police officer. A.T.'s mother also lives with them and cares for the children. The children have been placed with A.T. for around four years as the children each entered the system. When Long observed them in January 2022, she found the placement to be safe and appropriate with no signs of abuse or neglect or risk of harm. L.L., K.L., and E.L. are bonded with A.T. and none of the children have any special needs or developmental concerns. Long stated that it would be in their best interest to remain together as a sibling unit. Long was never directly told by A.T. that she might move to Texas.

¶ 67     G.L. was placed with a paternal aunt X.G. since he was five days old. In January 2022, Long observed G.L. in his placement and found it was safe and appropriate with no signs of abuse or neglect or risk of harm. There are no developmental concerns for G.L. The foster home also has children under the age of 13 as well as the foster mother's older daughter. The siblings see each other "frequently," and the children want to see each other more. X.G. testified that she wants to adopt G.L. Both foster parents signed a permanency commitment and have not changed their minds.

¶ 68    In contrast to the evidence presented, respondent's argument before us focuses only on her testimony that she believed A.T. was going to move with L.L., K.L., and E.L. to Texas and that the children would be traumatized. The trial court heard all of the evidence and rejected respondent's testimony. The court found it was "clearly in the best interest" of the children to terminate the parents' parental rights. Respondent has not presented any argument to counter this finding and the evidence supporting it. As discussed, the minors have been with their respective foster parents since shortly after birth and are safe and bonded to their foster parents, who wish to adopt them. The case had been ongoing for more than four years and the children have not been in respondent's care since that time with only supervised visitation. After reviewing the evidence presented along with the factors under the Juvenile Court Act, we conclude that the trial court's finding that it was in the best interest of the children to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 69    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 70    Affirmed.